IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 24, 2008 Session

STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES
v.
CEDRIC RENEE MIMS & ANGELA BROWN

In the Matter of N.B., C.B., & T.B.

Appeal from the Chancery Court for Shelby County
No. 05-1294-1    Walter L. Evans, Chancellor

No. W2007-02436-COA-R3-PT - Filed November 24, 2008

This appeal involves the termination of parental rights. The children were taken into protective custody soon after the birth of the youngest child, and were ultimately found to be dependent and neglected. The father was not appointed an attorney at this stage of the proceedings. Both the mother and father underwent psychological evaluations; both were found to be in the mild range of mental retardation and lacking the mental capacity to care for their children. DCS sought termination of their parental rights, alleging several grounds, including abandonment and mental incapacity. After a hearing, the lower court terminated the parental rights of both parents. The father appeals, arguing that DCS did not prove abandonment and mental incompetence by clear and convincing evidence. He also argues that the failure to appoint an attorney for him during the dependency and neglect proceedings was a denial of his right to due process. We affirm the trial court's finding on the ground of mental incompetence. We also find that any violation of Father's due process rights in relation to the dependency and neglect proceedings was remedied by procedural protections in place in the termination proceedings. Therefore, we affirm the termination of the father's parental rights.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and WALTER C. KURTZ, SP. J., joined.

André C. Wharton, Memphis, Tennessee, for the appellant Cedric Renee Mims

Robert E. Cooper, Jr., Attorney General and Reporter, and Douglas Earl Dimond, Senior Counsel, Nashville, Tennessee, for the appellee State of Tennessee, Department of Children's Services

Christina A. Zawisza and Jessica Erin Wood, Memphis, Tennessee, Guardian ad Litem

OPINION

This appeal involves three of the children born to Respondent Angela Brown ("Mother") and Respondent/Appellant Cedric R. Mims ("Father").[1] The children are daughter N. B. (born 12/03/97), son C.B. (born 01/11/01), and daughter T.B. (born 06/08/04).

At the time that T.B. was born in June 2004, Mother and the children were living with Father's sister, Tijuana Mims. Father was not living with them. For reasons that do not appear in the record, shortly after T.B.'s birth on June 8, 2004, Mother and the three children were "kicked out" of Father's sister's home. They were left homeless. The children were taken into protective custody by the Tennessee Department of Children's Services ("DCS") on June 22, 2004. At that time, Father's whereabouts were unknown.

At the time the children were taken into protective custody, N.B. was seven years old and had not yet been enrolled in school. She was developmentally delayed, educationally delayed, and had a significant anxiety disorder. C.B. was three and a half years old and was not yet toilet-trained. He was hyperactive, developmentally delayed, and had a marked expressive language delay. T.B. was an infant when taken into protective custody, but nevertheless showed early indications of developmental delay.

DCS filed a petition asking the Shelby County Juvenile Court to adjudicate N.B., C.B., and T.B. dependent and neglected. In the petition, the children's father was listed as "unknown."[2] DCS alleged that, because of Mother's mental deficiencies, she was unable to provide food, housing, transportation, and medical care for the three minor children, and that they were virtually homeless. DCS sought an immediate order of protective custody and the placement of the children with DCS, "pending a final adjudication of the issue of dependency and neglect."

The Juvenile Court granted the order for protective custody, and the children were placed in DCS custody pending a hearing on DCS's petition. Thereafter, the children were appointed a guardian ad litem, Christina Zawisza, through the Children and Family Litigation Clinic at the University of Memphis School of Law.

The first DCS permanency plan for the three children was prepared on July 14, 2004. By that time, Father had surfaced and his signature appears on the plans.[3] These plans listed reunification with the biological parents as the stated goal. Under the plans, Father's assigned tasks were to provide stable and adequate housing for the family, maintain gainful employment, and provide

---

[1] Mother and Father were not married when the children were taken into protective custody, but apparently married in 2007.

[2] It is unclear when Father became involved in these proceedings, but his signature appears on the first set of permanency plans, created in July 2004.

[3] At that time, Father had been established as the biological father of the two younger children, C.B. and T.B., but not yet as to N.B. Consequently, he participated in the July 2004 permanency plans for C.B. and T.B., but not N.B., the oldest of the three children at issue. Father was later found to also be the biological father of N.B.

financial support for the children, and visit the children. Initially, Father did not want to give DCS the address where he was living. During the ensuing months, Father gave DCS several different addresses, including the addresses of three of his sisters. He visited the children on occasion.

The hearing on DCS's pending dependency and neglect petition was scheduled for September 2004, but it was postponed so that Mother, Father, and the children could be evaluated by the LeBonheur Center for Children and Parents ("CCP").[4] The next permanency plan for the children was executed on March 4, 2005. By that time, Mother had been evaluated by CCP but Father had not. Mother's evaluation indicated that she had mild to moderate retardation, and was not mentally capable of caring for the children. Consequently, the goal for this set of permanency plans was changed from reunification with the biological parents to "exit custody to live with relatives/adoption." Father did not sign these permanency plans.

The hearing on the DSC dependency and neglect petition took place on March 24, 2005. At that point, Father had not yet been evaluated by CCP. The record does not indicate that Father was notified or issued a summons for the hearing. He had not told DCS that he was prepared to take custody of the children or support them financially. Father was not appointed an attorney to represent him at that time, and the record does not indicate that Father appeared at the March 24, 2005 hearing.

After the March 24 hearing, the Juvenile Court Referee found as follows:

1. The petition is sustained in that the children are dependant and neglected within the meaning of the law of the State of Tennessee in that said children are in such condition of want or suffering or are under such improper guardianship or control as to injure or endanger the morals or health of such children or others, . . . and in that said children are suffering from abuse and neglect . . . .
2. Children and their mother were rendered homeless and without any means of support in June 2004.
3. Mother has been determined through CCP Evaluation to be incapable of caring for children due to mental limitations.
4. It was not reasonable to make efforts to prevent removal from the home due to the exigency of the circumstances.

The Referee recommended that the children remain in DCS custody, and the Referee's findings and recommendations were confirmed by the Juvenile Court Judge. The children remained in foster care.

Up to March 2005, Father had been visiting the children on occasion but had made no progress on the other tasks assigned to him under the permanency plans. From March 2005 until

---

[4]CCP accepts cases of alleged child abuse or neglect and, through the work of social workers, psychologists, and other health professionals, performs a multi-disciplinary evaluation of the family situation. It uses this evaluation to make a recommendation to DCS regarding the appropriate method of intervention.

September 2005, Father did not visit the children and did not contact DCS to let DCS know where he was living or how to contact him.

Another set of permanency plans, with the same goals, were prepared in May 2005. Neither Mother nor Father participated in the preparation of these plans. The plans state that Mother "was invited to staffing," but that she was "not available when DCS arrived to transport her." Father's whereabouts remained unknown.

On July 12, 2005, DCS filed with the Shelby County Chancery Court a petition for termination of the parental rights of both Mother and Father. DCS alleged in the petition that Mother had still not obtained a suitable residence for the children or a stable source of income. It also alleged that Father had been advised to schedule regular visits with the children and to submit to a CCP psychological evaluation, but that he had not visited with the children during the four month period preceding the filing of the petition and had never submitted to the psychological evaluation. In this original petition, DCS alleged, as grounds for termination, both parents' failure to comply with the permanency plans.[5]

The fourth set of permanency plans were prepared in November 2005. By that time, Father had surfaced again and had visited the children, but had made no progress toward attaining suitable housing or providing financially for the family. DCS had not located suitable relatives with whom the children could be placed, so the permanency goal in these plans was changed to adoption. At that point, a potential adoptive family had not yet been identified, and DCS continued its attempts to identify one. Both parents apparently participated in the preparation of the November 2005 permanency plans.

On December 12, 2005, a hearing was held in the Juvenile Court with respect to the status of the permanency plans. The Referee found that neither Mother nor Father was in compliance with the permanency plans because neither had obtained adequate housing. She noted that Mother had undergone a psychological evaluation, which determined that Mother was mildly retarded and unable to care for her children. The Referee therefore found that the stated goal of adoption was in the children's best interest, and recommended approval of the permanency plans. This was confirmed by the Juvenile Court Judge.

A final set of permanency plans were prepared in November 2006. By the time these plans were prepared, DCS had identified the foster parents as prospective adoptive parents for all three children. Accordingly, the plans indicated that DCS would attempt to "move expeditiously in regards to pursuing a Termination of Parental Rights Hearing."

---

[5]DCS later filed a motion to amend the pleadings to conform to evidence that had been introduced at hearings on the petition. This motion was granted and DCS added, among others, abandonment and mental incompetence as grounds for termination.

Father finally underwent a CCP evaluation in 2007. The results showed him to be in the mild range of mental retardation, and lacking the cognitive capacity to understand the needs of his children or to parent them.

Hearings on the DCS petition for termination of parental rights were held in July and August 2007, after the foster parents had been identified as potential adoptive parents for the three children. By that time, an attorney had been appointed to represent Father. Several witnesses testified over a period of five non-consecutive days. At the outset of the hearings, Mother's attorney told the trial court that she wished to surrender her parental rights as to all three children.[6] Father continued to contest DCS's petition to terminate his parental rights.

During the course of the hearings, DCS filed a motion to amend the pleadings to conform to evidence that was introduced at the hearings. DCS sought to amend to include additional grounds for termination of parental rights. The motion was granted, and DCS amended its termination petition to add, *inter alia*, abandonment under Tennessee Code Annotated § 36-1-113(g)(1)[7] and mental incompetence under Tennessee Code Annotated § 36-1-113(g)(8).[8]

---

[6]Mother later withdrew her surrender, and requested hearings on the termination of her parental rights. Nonetheless, she has not appealed the termination of her parental rights, so we address the proceedings as they relate to Father.

[7]The definition of abandonment is provided in Section 36-1-102(1)(A). It states in pertinent part:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

T.C.A. § 36-1-102(1)(A)(i) (2005).

[8]This section provides:

(8)(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child.

(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and

(continued...)

-5-

At the outset of the hearings, the trial court heard testimony from the supervising psychologist for the LeBonheur CCP, Sonny Gentry, Ph.D. in clinical psychology ("Dr. Gentry"). Dr. Gentry described the evaluations of Mother and Father as "intelligence testing," formulated to assess the subject's ability to "cognitively operate in their world" and "make decisions and exercise judgment."

Dr. Gentry described Father as "a very well-intentioned fellow, sweet, sweet man who seemed to love his children in his own way." The intellectual testing, he said, showed Father with a full scale IQ of 59, in the mild range of mental retardation. Dr. Gentry said that, despite Father's good intentions, he did not have the "cognitive capacities to understand the needs of his children in any detail." He elaborated on CCP's conclusion:

> I really don't think [Father] would be capable of parenting any child. . . . He would not be able to on a sustained basis be able to supervise a child in terms of just providing the child's basic safety.
> He would not know how to recognize when a child was sick or what he needed to do to get a child medical attention. He certainly would not know how to help a child with schoolwork, homework, that sort of thing.

Asked whether any services could be provided Father to enable him to parent his children, Dr. Gentry responded:

> I don't believe so. Mental retardation is a lifelong condition. And although people can generally be trained somewhat and their functioning can be optimized somewhat, [Father's] level of functioning is such that . . . [no] amount of training, or education, or counseling could bring him up to the level where he could parent these children.

Consequently, Dr. Gentry said, CCP recommended the termination of Father's parental rights.

Dr. Gentry also testified about the results of CCP's psychological assessments of the children. He testified that N.B., who was seven years old at the time she was assessed, "was developmentally delayed, educationally delayed and . . . had a significant anxiety disorder." He said that she "would need really intensive education support." Dr. Gentry testified that C.B., who was

---

[8](...continued)

supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future, and

(ii) That termination of parental or guardian rights is in the best interest of the child.

(C) In the circumstances described under subdivisions (8)(A) and (8)(B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated.

*Id.* § 36-1-113(g)(8).

four at the time, was "a markedly hyperactive child, an inattentive child who was easily distracted. He showed some developmental delay, some educational delay. He had a really marked expressive language delay." Dr. Gentry said that C.B. needed "a lot of educational support, . . . a lot of fairly insightful and skillful behavior management and discipline techniques." Regarding T.B., Dr. Gentry stated, "She was six months old at the time, so we couldn't do a lot of evaluation on her," but nevertheless CCP's limited evaluation showed "some early indication that she might be developmentally delayed." All of the children, Dr. Gentry testified, would need "a parent who can really help them with their homework and educational struggles . . .; a parent who can get them to appointments with professionals who are providing the special care that they need." Dr. Gentry opined that Father would not be able to provide the support, permanence and stability that the children would need.

The foster mother and potential adoptive mother for all three children ("Foster Mother") testified at the hearings. By the time of the hearings, all three children had been living with Foster Mother for over a year. She testified about the children's myriad special needs, as well as her considerable efforts to accommodate them:

Q (by counsel for DCS): How long have you been the foster parent for [N.B., C.B., and T.B.]?
A: About a year and two months.
. . .
Q: Now, [N.B., C.B., and T.B.] have some special educational needs?
A: Yes, sir.
Q: And are you aware of what those needs are?
A: Yes, sir.
Q: What are they?
A: Well, [T.B.] goes to LEAD on Tuesday and Thursday. That's like for occupational therapy, speech therapy . . . and physical therapy.
Q: And do you take that child to those appointments?
A: Yes, sir.
Q: Okay. And are you willing to continue to take the children on those special appointments if the Court is to grant this Termination Petition?
A: Yes, sir.
Q: Are you aware of the children having, any of the children having any special medical needs?
A: Yes. [C.B.], he's ADHD. And he sees a psychologist—psychiatrist, I'm sorry.
Q: And how often do you take [C.B.] to the psychiatrist?
A: Once a month. . . .
Q: And are you willing to continue to take him to the psychiatrist in the event this Court grant this petition?
A: Yes, sir.
***
Q (by the Guardian ad Litem): . . . I have a few questions about [T.B.]. You spoke about the LEAD Program. What is that?
A: It is the . . . LeBonheur Early Intervention and Development Program.

Q: And how old is [T.B.] at present?
A: Three.
Q: And so she's not school age; is that correct?
A: Yes.
Q: What kinds of activities is [T.B.] engaged in at the LEAD program?
A: Well, she's—I mean, her legs were really weak when I got her. So they practice on . . . walking up and down the stairs. They take her to, I guess, occupational therapy. And her speech was really delayed, but . . . they said she's . . . progressed tremendously.
Q: And does the LEAD program expect you to work at home with [T.B.] and that type of thing?
A: Yes, they told me. Uh-huh, every night she's supposed to . . . carry heavy stuff before she goes to bed. It helps her legs so she can walk better.
Q: Okay. Let's talk about [C.B.]. How old is he now?
A: He's six.
Q: And you mentioned that his special need is ADHD?
A: Yes.
. . .
Q: And what special care do you have to give [C.B.] with regard to his ADHD needs?
A: I've been called to the school like five times, and I'd have to go up there. And I've actually like sat in on his lunch with him. And, you know—well, I really told him . . ., you should listen to what the teacher is saying . . . . But the teacher knows that they will call me and I'm there.
. . .
Q: Is [C.B.] on any medication?
A: Yes. He takes one pill a day, everyday. If he doesn't have it, he will just—it's bad. It's a bad day for him.
Q: And what kind of medication is he on?
A: He's on Adderal. I believe it's Adderal.
. . .
Q: Does [C.B.] have trouble—does he wet the bed?
A: Yes, uh-huh.
Q: And how often does that happen?
A: Every night.
Q: And what do you do to address that issue?
A: Well, I try to get him up in the—well, I do get him up. But [C.B.], I believe that's just a problem that he has because I can literally wake up five times through the night
. . . .
Q: He's been taken to the doctor, hasn't he?
A: Yes.
Q: And have the doctors found any physical reasons for it?
A: No.
Q: Okay. Let's talk about [N.B.]. How old is [N.B.]?
A: [N.B.] is nine.

Q: And what are [N.B.'s] special needs?
A: She's developmentally delayed; that's what the school says. She's developmentally delayed. And she sees a psychiatrist for the things that, I guess, that she's been going through right now. And the tutoring, she goes to a tutor.
. . .
Q: How often a week does she go to tutoring?
A: Four days a week.
. . .
Q: Does [N.B.] have an IEP?
A: Yes, she does.
Q: What is an IEP?
A: An Individual Educational Program.
Q: And has she been diagnosed by the school system with any diagnoses?
A: Yeah. I believe it's developmentally delayed and mentally retarded, I believe.
. . .
Q: Have you observed improvements in [N.B.] since she's been in your house?
A: Yes.
Q: What kind of improvements?
A: Well, the teacher—the last time I saw her teacher was towards the end of the year. They told me that she's now reading on her own. When she first came, like I said, she didn't—she didn't read or anything. So she's reading on her own. And she's—I mean, she just got straight A's and B's. She got academic improvement. . . .
Q: Have you gone to IEP meetings for [N.B.]?
A: Yes.
Q: How often?
A: Whenever they—whenever they are.

Foster Mother testified that she and her husband both worked for an airline, and that both had flexible work schedules that permitted them to take off work to accommodate the children's needs.

Father's testimony demonstrated the level of his understanding of his children's special needs. First he was asked about the needs of the oldest child, N.B.:
Q (by the Guardian ad litem): We've talked about the fact that [N.B.] is a special needs child. Just tell the Court what you understand special needs means?
A (by Father): Say it again. Say it again.
Q: Special needs, when I say those words to you, what does it mean?
A: Like, take her to the doctor and stuff.
Q: Does it mean anything besides taking her to the doctor?
A: Yeah. Take her to the doctor, take her to school, buy her clothes and shoes, and all of that.
Q: Do you know whether [N.B.] has any special diagnoses?
A: No, I don't know nothing about that.
Q: Have you ever heard anyone call her developmentally delayed?
A: No.

Q: Have you ever heard anyone say that she has been diagnosed as mentally retarded?
A: Uh-uh. Ain't nobody ever told me that.
Q: Tell us what kind of help you think [N.B.] needs with her schoolwork?
A: What you say? Say it again.
Q: What kind of help does [N.B.] need with her schoolwork?
A: Like, probably a tutor or something like that.
Q: Let me ask it a different way. How specifically will you help [N.B.] with her schoolwork?
A: I'm going to have some help with [N.B.].
Q: I'm sorry, I didn't understand you?
A: I said I'm going to have some help with [N.B.].
Q: You're going to have some help with [N.B.]?
A: Yeah.
Q: So somebody else is going to help her with her schoolwork?
A: Somebody else is going to help me and her with schoolwork.
Q: Do you know where [N.B.] goes to school?
A: No, ma'am.
Q: Do you know what grade she's in?
A: No, ma'am.
Q: Do you know what subjects she's studying?
A: No, ma'am.
Q: Do you know what an IEP is, Mr. Mims?
A: No, ma'am.
Q: Do you know if [N.B.] has an IEP?
A: I don't know about that.
Q: Do you remember going to [N.B.'s] school when I was there and Ms. Nathaniel was there about a year ago?
A: Yeah I went to the school.
Q: Do you know why you were there?
A: No, not really.
Q: You don't know why you were there. You don't remember us discussing her individual education plan?
A: (Witness shakes head.)
Q: Can you answer verbally, please?
A: No, ma'am.

Father was also asked about the special needs of the two younger children, C.B. and T.B.:

Q (by counsel for DCS): Well, let's talk about those special needs. What does [T.B.] require?
A: She got to go to a doctor named Bubbleby . . . .
Q: When is the last time you took [T.B.] to the doctor?
A: I ain't never took her to the doctor.
Q: Is that all she requires, Mr. Mims?

A: (No verbal response.)
Q: Is that all she requires, Mr. Mims?
A: That's all the things I know.
Q: That's it?
A: Right.
. . .
Q: Does [C.B.] have any special medical or educational needs . . .?
A: Well, he's hyper. He have to go to the clinic and stuff.
Q: He has to go where?
A: To the clinic.
Q: Okay. And have you ever taken him to the clinic?
A: Not none.
Q: You haven't. And as a matter of fact, he takes medication; is that correct?
A: Who?
Q: [C.B.].
A: Yeah.
Q: And you have never filled a . . . prescription for [C.B.], have you?
A: No.

The trial court also heard testimony from the foster care case manager for the children, Carol Nathaniel. Nathaniel supervised visits between Father and his children. She said that she had to "supervise the visits very carefully and redirect the children at all times. The parents gave little help with redirecting the children. I did a lot of the redirection . . . every visit." When asked what she meant by redirection, she explained, "Whenever the kids misbehave, such as running, jumping, cursing, hitting, I'm going to redirect them. I often put them in time out as needed."

In response to questions from the court regarding the absence of Father's signature on a permanency plan, Nathaniel testified about DCS's futile attempts to contact Father from March 2005 to September 2005. During that time, she said, Father did not visit the children or contact DCS.

Father initially disputed Nathaniel's testimony that he did not attend DCS-arranged family visits between March and September 2005.[9] His testimony, however, suggested a nomadic lifestyle:

Q (by counsel for DCS): Isn't it true that in the last three years you have stayed in at least six places?
A (by Father): (No verbal response.)
Q: How many places have you stayed . . . from 2004 up to now, 2007?
A: (No verbal response.)
Q: I can help you. Last week or two weeks ago you testified—
A: I got it. Hold up, I got it. I said—I did say six.

---

[9] The children's prior foster mother and the foster mother's adult daughter testified that Father's visitation with the children was "pretty regular," but did not offer specifics. The daughter offered to assist Father if he obtained custody.

Q: Okay. So it would be fair to say that staying in six places in three years, that it's pretty difficult for DCS to keep in contact with you?
A: No. Because it ain't difficult because I had a baby mamma. She could have—they could have asked her to call me or something like that.
Q: Yes. But—
A: But didn't nobody call me.
Q: Was it not your job also to contact DCS?
A: Well, they didn't give me no number where they was. . . .

At one point in Father's testimony about his living arrangements, he offered at least five different addresses: houses or apartments where he was living, on either a permanent or temporary basis; the addresses of relatives with whom he was staying temporarily; rental units; and places where he wished to receive his mail.

Father asserted at the hearing that the children could live with him in the one bedroom duplex in which he and Mother were residing, and testified about his efforts to obtain a house for the family:

Q (by counsel for DCS): Where would three children stay at, Mr. Mims?
A (by Father): In a house.
Q: In a house?
A: Yeah, a house.
Q: But you don't have a house?
A: We've been looking for one.
Q: You're looking for a house?
A: Yeah.
Q: How long have you been looking for a house, Mr. Mims?
A: A long time, for a while.
Q: How long?
A: Since September.
. . .
Q: Since September of what year?
A: 2005 and 2006.
Q: Okay. And you're not any closer to buying a house now than you were in September of 2005; is that correct?
A: I ain't close yet. I've been looking.
Q: Okay. So, in all actuality, if you were to be reunified with your children today, you wouldn't have a place for them to stay? Would that be a fair indication?
A: I will because I—or I would—we would find somewhere to stay. I would find a place.

At the time of the proceedings, Father's only source of income was Social Security disability in the amount of $674 per month, and he testified to regular expenditures in the amount of $515 per month, not including any amounts that he would need to spend to provide for the children's basic needs. He had not worked in some time, and was reluctant to accept help from DCS in finding employment.

-12-

At the conclusion of the testimony, the trial court issued an oral ruling terminating the parental rights of both Mother and Father. In its oral ruling, the trial court stated that it relied especially on the testimony of Dr. Sonny Gentry to find clear and convincing evidence that neither parent would ever be able to care for the children.

In the trial court's subsequent written order, entered on October 4, 2007,[10] it noted that Father had been established as the biological father of N.B., C.B., and T.B. At the time of removal of the children from Mother's custody, the trial court observed, Father "was non-existent and his whereabouts were unknown." It found that Father "had moved and relocated and stayed in approximately six different locations from 2004 to the present."

As to Father's mental ability to parent the children, the trial court found that "the overwhelming proof established that [he does] not have the intellectual capacity to permanently parent these children over a long period of time." The court based this finding primarily on the testimony of Dr. Gentry. The trial court noted that Father had been evaluated by CCP to be in the mild range of mental retardation, and that "Dr. Sonny Gentry's testimony established that due to their mental incapacity these parents will never be able to permanently parent these children and provide for their needs over a long period of time." Accordingly, the trial court found that DCS had, by clear and convincing evidence, established mental incompetence as the ground for termination of parental rights under Tennessee Code Annotated § 36-1-113(g)(8).

In addition to mental incompetence, the trial court found that Father abandoned the children by willfully failing to visit them during the four-month period preceding the filing of the petition for termination.

The trial court concluded that termination of parental rights would be in the best interest of the children because:

(a) the Parents have not made such adjustment of circumstances to make it safe and in the Children's best interests to be in the home of the Parents;
(b) removal of the Children from the care of [Foster Mother] will negatively [affect] their emotional, psychological and mental condition; and
(c) the Parents' mental status prevents them from effectively providing safe and stable care and supervision for the Children.

Custody of the children was awarded to DCS, with the right to place the children for adoption and to consent to such adoption.

Father filed a timely notice of appeal. Mother has not appealed.

---

[10]A previous order had been entered on September 25, 2007, but had not been signed by all of the parties. Upon motion of the Guardian ad Litem, that motion was set aside, and a new final order entered on October 4.

-13-

On appeal, Father raises two general issues. First, he asserts that DCS failed to establish, by clear and convincing evidence, the existence of grounds for the termination of his parental rights. Specifically, Father argues that there was no showing of reasonable efforts on the part of DCS, and that the evidence does not preponderate in favor of a finding of either incompetence under Tennessee Code Annotated § 36-1-113(g)(8), or abandonment under Tennessee Code Annotated §§ 36-1-113(g)(1) and 36-1-102. Second, Father asserts that he was denied due process because, although he was involved in the first permanency plan dated July 14, 2004, he was not appointed an attorney until January 2007.

In Tennessee, the termination of parental rights is governed by statute. Termination of parental rights must be based upon:

> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

T.C.A. § 36-1-113(c)(1), (2) (2005). The grounds upon which parental rights may be terminated include abandonment, as the term is defined in section 36-1-102. *Id.* § 36-1-113(g)(1), (8). Grounds for termination are also established if the court finds that the parent is "mentally incompetent to provide for the further care and supervision of the child." *Id.* § 36-1-113(g)(8).

DCS must prove both grounds and best interests by clear and convincing evidence because "the decision to terminate parental rights involves fundamental constitutional rights." *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). Meeting this standard "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005) (citations omitted). "It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* (citations omitted).

In our review of termination proceedings, we review the trial court's findings of fact under Rule 13(d) of the Rules of Appellate Procedure, applying a *de novo* standard and presuming the findings to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). We go on, however, to also "determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). Once we determine whether grounds for termination have been established by clear and convincing evidence, we look at whether it has been proven by clear and convincing evidence "[t]hat termination of the parent's . . . rights is in the best interests of the child." T.C.A. § 36-1-113(c)(2) (2005). The statute lists numerous factors to be considered in determining whether termination is in the child's best interest. *Id.* § 36-1-113(i). Courts are permitted to consider other factors not contained in the statute. *Id.*

We first review the trial court's finding that Father was mentally incompetent to care for his children. To establish mental incompetence as a ground for termination, the party seeking termination must show, by clear and convincing evidence, that:

> (i) The parent . . . of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's . . . mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent . . . will be able to assume or resume the care of and responsibility for the child in the near future, and
>
> (ii) That termination of parental . . . rights is in the best interest of the child.

*Id.* § 36-1-113(g)(8)(B)(i), (ii). If the ground for termination is mental incompetence, "no willfulness in the failure of the parent . . . to establish the parent's . . . ability to care for the child need be shown to establish that the parental . . . rights should be terminated." *Id.* § 36-1-113(g)(8)(C); *see also State, Dep't of Human Services v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990).

In arguing that mental incompetence was not established by clear and convincing evidence, Father relies primarily on the case of *State, Dep't of Children's Services v. Whaley*, No. E2001-00765-COA-R3-CV, 2002 WL 1116430 (Tenn. Ct. App. May 30, 2002). In *Whaley*, DCS sought termination of the mother's parental rights based on incompetence and persistence of conditions. *Id.* at *4–5. Among other limitations, the mother was legally blind and suffered from a seizure disorder. *Id.* at *1. At the hearing on the petition to terminate the mother's parental rights, a psychologist testified as an expert witness, opining that the mother had mild mental retardation. *Id.* at *5. On cross examination, the psychologist conceded that although some of the tests administered to the mother required visual responses, no accommodation had been made for the mother's visual impairment. *Id.* at *6. He testified that the mother would only have been able to care for her child with "24/7" assistance. *Id.*

The trial court in *Whaley* held that the mother's parental rights should be terminated, based partly on the ground of incompetence. *Id.* at *8. The decision was reversed on appeal. *Id.* at *15. Discussing the issue of mental incompetence, the appellate court stated:

> While it is uncontroverted that Ms. Whaley has a low IQ and has been diagnosed as mildly mentally retarded, we find that the State has not proven by clear and convincing evidence that Ms. Whaley is incompetent to such a degree that she is unable to care for her child now or that she will be unable to care for him in the future. Ms. Whaley has managed to live alone and take care of herself for several years. She has attended almost every scheduled visitation with her son. When Ms. Whaley lived in Smyrna and was in vocational training she rode a Greyhound bus back to Cleveland every other weekend to visit with her son. She has been able to regulate and properly administer her own prescription medications. She has completed vocational training and has obtained a job. She is able to move about the community using public transportation. Ms Whaley manages to get herself to work on the correct days and at the correct time as well as attending church every Sunday. Most importantly, Ms. Whaley has a friend who is a retired educator and foster

parent willing to assist her in the parenting of her child. These factors negate the argument that Ms. Whaley is incompetent to provide care and supervision to a child.

*Id.* at *14.

Clearly, the facts in the case at bar are distinguishable from those in **Whaley**. The testimony established that Father has been unable to maintain regular employment, unable to support his children, and unable to obtain a home suitable for the family. His history of impermanent living arrangements and his failure to attend regular visitations for a period of several months, as found by the trial court, stand in stark contrast to the mother's steadfast efforts in **Whaley**.

Father also points out that the court in **Whaley** found that the availability of a foster parent willing to work with the mother was a positive factor, and notes that, in this case, the adult daughter of the children's former foster parent offered to assist Father. However, the evidence in this case, including the testimony of Nathaniel, Dr. Gentry, and Father himself, makes it clear that the "assistance" needed to ensure that these children received proper care would have to, in effect, be a substitute parent, with Father acting only as a caring but incompetent bystander. These children need and deserve a parent who can take care of them.

Father asserts that DCS failed to prove that it made reasonable efforts to reunite Father with his children. In many cases, after removal of children from their parents' custody, DCS is required to use reasonable efforts to return the children home. T.C.A. § 37-1-166(a)(2) (2005); *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *11 (Tenn. Ct. App. June 30, 2005). Reasonable efforts need not be shown, however, if the termination of parental rights is based on the parent's impaired mental capacity. *In re. C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *6 & n.20 (Tenn. Ct. App. Mar. 9, 2004).

The testimony in this case demonstrates the reason for the distinction. Dr. Gentry testified clearly that Father's mental retardation was a "lifelong condition" and that he functioned in such a low range that no amount of training, education, or counseling "could bring him up to the level where he could parent these children." Under these circumstances, we find that a showing of reasonable efforts was unnecessary, and that the trial court did not err in finding that the ground of mental incompetence was proven by clear and convincing evidence.

Father also challenges the trial court's finding of abandonment. We need only find that one ground for the termination of parental rights was established in order to uphold the trial court's decision. *In re S.R.C.*, 156 S.W.3d 26, 28 (Tenn. Ct. App. 2004) (citations omitted). Therefore, our holding on the grounds of mental incompetence pretermits any issue related to the additional ground of abandonment.

Finally, Father asserts that he was denied due process because he was not provided an attorney during the hearings on the dependency and neglect petition. From our review of the record, Father did not raise the issue of his due process rights in the lower court. We will usually decline to address the merits of an issue not raised in the proceedings below, as to which no evidence was

introduced and no arguments were heard at trial.  ***See Lawrence v. Stanford***, 655 S.W.2d 927, 929 (Tenn. 1983) (citations omitted).

Nevertheless, we will address the issue briefly.  Because a parent's right to the care, custody, and control of his child is a fundamental constitutional liberty interest, he is guaranteed certain procedural protections when the State seeks to abridge that interest.  ***See Troxel v. Granville***, 530 U.S. 57, 65–66 (2000); ***see also Hawk v. Hawk***, 855 S.W.2d 573, 578 (Tenn. 1993).  Tennessee Supreme Court Rule 13 requires the trial court to "advise any party without counsel" of his right to counsel and to appoint such counsel upon request in any case "involving allegations against parents that could result in finding a child dependent or neglected or in terminating parental rights."  Tenn. Sup. Ct. R. 13 § 1(d)(2)(B).  This Court has previously held, however, that any violation of a parent's due process rights "that may have occurred at the dependent and neglect proceeding, was fully remedied by the procedural protections provided . . . at the termination hearing."  ***In re S.Y.***, 121 S.W.3d 358, 366 (Tenn. Ct. App. 2003).

Here, Father was appointed counsel more than two years after the dependency and neglect petition was granted and his children were taken into DCS custody.  While he argues that his due process rights were violated at the dependency and neglect stage, he does not argue that he did not receive due process in the termination proceedings.  Father had adequate notice of the termination proceedings, appeared at the hearings, brought witnesses to testify, and had a very capable attorney ably representing his interests at the termination hearings.  Under all of these circumstances, the failure to appoint counsel in the dependency and neglect proceedings is not ground for reversal of the termination of Father's parental rights on appeal.  ***See id.*** at 365–66.

Therefore, we find no error in the trial court's finding that the ground of mental incompetence under Tennessee Code Annotated § 36-1-113(g)(8) was established by clear and convincing evidence, and likewise that termination of Father's parental rights was proven by clear and convincing evidence to be in the best interest of N.B., C.B., and T.B.

The decision of the trial court is affirmed.  The costs of this appeal are taxed to Appellant, Cedric Renee Mims, and his surety, for which execution may issue if necessary.

_____

HOLLY M. KIRBY, JUDGE