IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 13, 2014

IN RE CHELSEA B. ET AL.

Appeal from the Juvenile Court for Hawkins County
No. HJ-13-0819     Daniel G. Boyd, Judge

No. E2014-00758-COA-R3-PT-FILED-NOVEMBER 25, 2014

This is a termination of parental rights case involving three minor children.  In April 2012, temporary custody of the children was granted to the Tennessee Department of Children's Services ("DCS"), and the children were placed in foster care.  DCS subsequently filed a petition to terminate the parental rights of the mother and father on September 24, 2013.  The petition alleged, as statutory grounds for termination, abandonment by failure to provide a suitable home, substantial noncompliance with the permanency plans, persistent conditions, and severe child abuse.  Following a bench trial, the trial court granted the petition as to the mother upon finding that DCS had proven  by clear and convincing evidence the grounds of (1) abandonment by failure to provide a suitable home and (2) persistence of the conditions leading to removal.  The court also found clear and convincing evidence that termination of the mother's parental rights was in the children's best interest.  The mother has appealed.[1] Discerning no error, we  affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and D. MICHAEL SWINEY, J., joined.

Gerald T. Eidson, Rogersville, Tennessee, for the appellant, Jennifer B.

Robert E. Cooper, Jr., Attorney General and Reporter, and Eugenia Izmaylova, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

---

[1]The father has not appealed the termination of his parental rights.

Deborah A. Yeomans-Barton, Johnson City, Tennessee, Guardian Ad Litem.

**OPINION**

I. Factual and Procedural Background

Jennifer B. ("Mother") is the mother of three children: Chelsea B., now age eleven; Joey B., now age ten; and Cheyanne B., now age six ("the Children").[2] On April 16, 2012, DCS and a law enforcement officer went to the home of Mother and Joey B. ("Father"), in order to investigate a referral alleging environmental neglect, physical abuse, and drug exposure. When the DCS investigator and the officer arrived at the home, they found Cheyanne (who was four years old at the time) playing unsupervised outside in a van. Father was sleeping inside the home. Mother and the other two children were not at home. The DCS investigator described the conditions inside the home as "deplorable," with the residence exhibiting garbage and dirty clothing littering the home, animal feces scattered about and smeared on the wall, cockroaches, and a foul odor. When Father was screened for drugs, he tested positive for opiates but could produce no prescription. The Children were also dirty and smelled of animal feces. DCS removed the Children that day, placing them in protective custody. This was the third occasion DCS had removed the Children from their parents' custody.

On August 14, 2012, the trial court adjudicated the Children to be dependent and neglected, based on Mother's stipulation that there was clear and convincing evidence that the home was not appropriate for the Children on the day of the removal. DCS worked with the parents to create permanency plans with a goal of reunification and began assisting the parents with their responsibilities pursuant to the plans. Upon placement into DCS custody, Chelsea disclosed during a forensic interview that she had been the victim of sexual abuse while in the care of her parents. Chelsea indicated that Father, her maternal grandfather, and a cousin had sexually abused her. She also indicated that Mother was aware of the abuse.

During further investigation, Joey also disclosed that he had been the victim of sexual abuse by Father and the maternal grandfather. Both girls were examined by a medical practitioner, who found physical signs consistent with sexual abuse. After the investigation was complete, DCS indicated Father as a perpetrator of sexual abuse upon the Children. At some point, Father's cooperation with DCS ceased.

On September 24, 2013, DCS filed a petition seeking to terminate the parental rights

---

[2]The youngest child's name is spelled "Cheyenne" on some documents in the record, but we note that the correct spelling is "Cheyanne" pursuant to her birth certificate.

of both parents. As grounds in support of the petition, DCS alleged that (1) the parents had abandoned the Children by failing to provide a suitable home, (2) the parents had failed to substantially comply with the requirements of their permanency plans, (3) the conditions leading to removal still persisted, and (4) the Children were victims of severe child abuse.

The trial court conducted a hearing on March 21, 2014, regarding the petition. Although Father's counsel was present, Father did not appear. Consequently, DCS moved for a default judgment against Father at the beginning of the hearing. The trial court granted a default judgment as to Father, such that the hearing was conducted solely regarding the allegations of grounds pertaining to Mother. After considering the testimony of numerous witnesses, the trial court ruled that Mother's parental rights should be terminated based upon the statutory grounds of persistence of conditions leading to removal and abandonment by failure to provide a suitable home. The court further ruled that DCS had not proven the grounds of substantial noncompliance with the permanency plans and severe abuse by clear and convincing evidence. The trial court also found that termination was in the best interest of the Children. Mother has appealed.

## II. Issues Presented

Mother presents the following two issues for our review, which we have restated slightly:

1.      Whether the trial court erred in determining that Mother abandoned her children by failing to provide a suitable home pursuant to Tennessee Code Annotated 36-1-113(g)(1) and 36-1-102(1)(A)(ii).

2.      Whether the trial court erred in determining that the conditions leading to removal still persisted pursuant to Tennessee Code Annotated 36-1-113(g)(3).

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *Id.*; Tenn. R. App. P. 13(d). Questions of law, however, are reviewed *de novo* with no presumption of correctness. *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and

shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has instructed:

> In light of the constitutional dimension of the rights at stake in a termination proceeding under Tenn. Code Ann. § 36-1-113, the persons seeking to terminate these rights must prove all the elements of their case by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808-09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The purpose of this heightened burden of proof is to minimize the possibility of erroneous decisions that result in an unwarranted termination of or interference with these rights. *In re Tiffany B.*, 228 S.W.3d 148, 155 (Tenn. Ct. App. 2007); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005). Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings. *In re Valentine*, 79 S.W.3d at 546; *State Dep't of Children's Servs. v. Mims* (In re N.B.), 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008).

*In re Bernard T.,* 319 S.W.3d at 596.

## IV. Abandonment

Tennessee Code Annotated § 36-1-113 (2014) lists the statutory grounds for termination of parental rights, providing as follows:

> (a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

. . .

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that Mother had abandoned the Children by failing to establish a suitable home. Tennessee Code Annotated § 36-1-113(g)(1) provides, as a statutory ground for termination:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred . . . .

Tennessee Code Annotated § 36-1-102(1)(A) (2014) defines abandonment, in relevant part, as:

(ii) The child has been removed from the home of [a] parent or parents or a guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist [a] parent or parents or a guardian or guardians to establish a suitable home for the child, but that [a] parent or parents or a guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in

the custody of the department; . . . .

In its final order, the trial court included the following specific findings regarding, *inter alia*, Mother's failure to establish a suitable home:

9.  The Court finds in order to prevail with respect to the ground of failure to provide a suitable home DCS would have to prove by clear and convincing evidence that the house was and continues to be in deplorable condition, specifically for the four months after the children came into custody.

10. The Court finds testimony has been presented from numerous witnesses today that the mother has a persistent issue with cockroach infestation in her home.

11. The Court finds this issue has been addressed with the mother several times, and even by her own admission this continues to be a problem which has not [been] sufficiently addressed. Mother has taken some unsatisfactory remedial steps through the use of different roach bombs, but upon her own admission has never once called an exterminator.

12. The Court finds there have been times wherein Youth Villages came to the home and observed some animal feces, but it was cleaned up immediately.

13. The Court finds that the mother has not taken the appropriate steps to rectify the conditions in the home and, therefore, the Court finds by clear and convincing evidence that the Department has proven by clear and convincing evidence that the mother has abandoned the children for failing to provide a suitable home, and ground three, that the conditions leading to the removal continue to persist today.

14. The Court finds the children have been in the custody of DCS for 23 months, and the conditions continue to persist, specifically with respect to the cockroach infestation. The mother continues to cook on a stove that is infested with cockroaches and then feed the children the food that is cooked on that stove.

15. The Court finds Exhibit number 3, which was the video that shows the cockroaches in the stove showed what is basically the clock area of the

stove encased in a plastic or glass casing that it appears to the Court to be approximately a three inch by five inch area that was half full with cockroaches, many of which were still alive and probably some of them were dead cockroaches, but they had not been cleaned out.

16.     The Court finds DCS has proven by clear and convincing evidence that the conditions [that led] to removal persist and that the mother has failed to provide a suitable home for the children.

17.     The Court finds DCS has proven by clear and convincing evidence that the children are victims of severe abuse.

18.     The Court granted DCS's motion for default judgment against the father, however, the severe abuse applies only to the father. The father has failed to participate in any manner with DCS, or in this Court proceeding. The father, through counsel, made it clear he was not going to participate, however the severe abuse finding applies only to the father.

19.     The Court does not find that DCS proved by clear and convincing evidence that the mother failed to protect the children.

The trial court also in its conclusions determined that "[t]he proof showed that the home where the mother resides continues to be in a deplorable condition" and that DCS had made reasonable efforts to assist Mother. The court thus determined that the ground of abandonment by failure to provide a suitable home had been proven by clear and convincing evidence.

After a thorough review of the record, we conclude that the evidence adduced at trial supports this determination. The trial court's findings, made under a clear and convincing evidence standard, are supported by a preponderance of the evidence. One reason for the removal of the Children from Mother's home was environmental neglect due to the extremely unsanitary conditions found within the home. Mother stipulated that there was clear and convincing evidence that the home was not appropriate for the Children on the day of the removal, thereby resulting in an adjudication that the Children were dependent and neglected in August 2012. The evidence demonstrated that at the time of removal, the home was found to be foul-smelling; cluttered with dirty clothing, dishes, and garbage; infested with cockroaches; and soiled by animal feces on the floor and a wall.

During the twenty-three months following the removal of the Children, DCS made

reasonable efforts to assist Mother in providing a suitable home, as the trial court accordingly found. These efforts included: (1) placing in-home service providers within Mother's home to assist her with housekeeping and parenting skills, (2) conducting routine "safety sweeps" of the home so that Mother could enjoy supervised visitation with the Children within the home, (3) discussing the cockroach problem with Mother's landlord and offering to purchase chemical treatment for the home, (4) providing Mother with advice regarding sanitation, and (5) providing Mother with a trash can. The proof demonstrated that although Mother did make certain attempts to clean the home and control the cockroach infestation, the same unsanitary conditions existed within the home at the time of trial. Service providers testified that the residence remained dirty and cluttered. A video taken shortly before trial revealed a compartment in the top of Mother's stove that appeared to contain literally hundreds of dead and living cockroaches.

Mother admitted at trial that the cockroach problem persisted, stating that there was little she could do because she lived in a trailer park. Mother conceded that she had never utilized an exterminator. Mother also admitted that her home remained cluttered, blaming this problem on either having to remove items from her car, which had been towed for repairs, or the landlord's remodeling of her bedroom floor. As the DCS case manager testified, Mother refused to accept responsibility for her problems, while demonstrating an uncooperative and sometimes hostile attitude toward any assistance.

Of additional concern, several service providers testified that they had seen evidence of Father's still residing in the home with Mother, despite her assertions to the contrary. Father, having been indicated as a perpetrator of sexual abuse on the Children, was not allowed to be around the Children pursuant to the trial court's order.[3] Mother testified at trial that Father was no longer living with her and that if the Children were returned to her care, they would not be in his presence. Mother admitted, however, that she and Father were still married and that she depended on him for financial assistance. Mother's monthly disability payments of $544 barely covered her rent of $475. According to Mother, Father provided her with his entire federal supplemental security income check every month to assist her in keeping her home. When questioned regarding how Father was able to support himself, Mother explained that he relied upon the charity of family members.

The court liaison for DCS testified that she had seen Mother and Father shopping together at Wal-Mart a few months before trial. She had also observed the parents leaving the DCS office together. The in-home counselor for Youth Villages, who monitored visitations between Mother and the Children, testified that she had seen Father's belongings in Mother's home and had once also witnessed Father walking back toward the home

---

[3]Father also had a lengthy criminal history as well as a history of drug abuse.

immediately following visitation. The clinic supervisor who performed safety sweeps of Mother's home for Youth Villages also stated that she had discovered Father's clothing in Mother's home on various occasions. It was also shown that Mother often videotaped visits with the Children to share with Father.

Mother offered at trial that she did not believe that Father had sexually abused the Children. While Mother admitted that she still talked to Father, seeing him at least once or twice per month, she denied that he was living with her. According to Mother, the two remained married, and she expressed no plans to divorce. When questioned, Mother admitted her financial dependence upon her husband. Based on the evidence, Mother does not appear to appreciate the risks associated with subjecting the Children to the company of Father. Such an environment would likely make it unsafe for the Children to be returned to Mother's home.

In addition, the counselor who performed the parenting assessment of Mother testified that she felt Mother needed an alcohol and drug assessment by reason of Mother's previous arrest for narcotics and Mother's current use of several medications with addictive characteristics. Mother admitted at trial that she was using oxycodone and Klonopin. The counselor and other providers found that Mother was very harsh with the Children, appearing to lack the ability to be affectionate or nurturing. The counselor testified that Mother seemed irritated and unhappy while visiting the Children, even though she had the opportunity to spend little time with them. The counselor and other witnesses expressed significant concerns about the prospect of returning the Children to Mother's care.

A "suitable home" requires more than simply a proper physical space; a suitable home should be, "at a bare minimum, a home that [is] safe, clean, and nurturing to these children." *See In re Pauline M.*, No. E2009-02649-COA-R3-PT, 2010 WL 4515062 at *9 (Tenn. Ct. App. Nov. 10, 2010). *See also In re S.H.*, No. M2007-01718-COA-R3-PT, 2008 WL 1901118 at *6 (Tenn. Ct. App. Apr. 30, 2008). Having carefully considered the proof presented, we determine that the evidence preponderates in favor of the trial court's determinations that DCS made reasonable efforts to assist Mother and that Mother has demonstrated a lack of concern for the Children to such a degree that it appears unlikely she will be able to provide a suitable home for them at an early date. Because of the proof of environmental dangers, the potential danger presented by Mother's association with Father, and Mother's apparent lack of concern regarding the Children, we conclude that there was clear and convincing evidence that Mother abandoned the Children by failing to provide a suitable home.

## V.  Persistent Conditions

Tennessee Code Annotated § 36-1-113(g)(3) provides the following as an alternative ground for termination of parental rights:

> (3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> > (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of [a] parent or parents or a guardian or guardians, still persist;
> >
> > (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to [a] parent or parents or a guardian or guardians in the near future; and
> >
> > (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . . .

As stated above, by its order terminating Mother's parental rights, the trial court, *inter alia*, found that the conditions existing at the time of removal still persisted.  The court specifically found that Mother "consistently had a roach infestation over the course of the custody episode and the home has been in deplorable condition and remains that way." Upon our thorough review of the evidence, we agree.

At the time of trial, the Children had been removed from Mother's home for twenty-three months.  The evidence demonstrated that the conditions that led to removal and other conditions that could likely cause the Children to be subjected to further abuse or neglect persisted at the time of trial.  The conditions in the home had not improved.  The home remained unsanitary and an unfit place for the Children to live, as it had been at the time of their removal.  In addition, due to the disclosures regarding sexual abuse by Father and Mother's continued involvement with him, it would be unsafe for the Children to be returned to her home.

Various service providers testified that Mother would be unlikely to remedy the conditions because she refused to take responsibility for the problems in the home, was

difficult to work with, and was hostile toward their involvement. Mother had failed to take the steps necessary to remedy the problems in her home despite three custody episodes, the latest of which had lasted nearly two years. The Children expressed fear regarding a return to Mother's home and experienced regression in bad behaviors before and after the periods of visitation. It was shown that the Children were happy and well adjusted in their foster placement, however, and were thriving in school and therapy. The Children experienced a loving and affectionate relationship with their foster parents, who would be willing to adopt the Children if they were available. Therefore, based on a thorough review of the evidence, we conclude that the trial court properly found clear and convincing evidence of this statutory ground for termination of parental rights as well.

## VI. Best Interest of Children

While Mother has not appealed the trial court's finding that it is in the Children's best interest to terminate her parental rights, because of the significance of this issue, we have considered it. *See In re Arteria H.*, 326 S.W.3d 167, 184 (Tenn. Ct. App. 2010). When at least one ground for termination of parental rights has been established, as here, the petitioners must then prove, by clear and convincing evidence, that termination of the parent's rights is in the Children's best interest. *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit by establishment of a ground for termination, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005).

After reviewing the record, we find that there is clear and convincing evidence that termination was in the Children's best interest. Therefore, we affirm the trial court's termination of Mother's parental rights.

## VII. Conclusion

For the reasons stated above, we affirm the judgment of the trial court terminating the parental rights of Mother. Costs on appeal are taxed to the appellant, Jennifer B. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE

-11-