IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned On Briefs September 2, 2010

**IN THE MATTER OF: SHANYA A.A.** (d.o.b. 2/17/07), A Child Under
Eighteen Years of Age

**Direct Appeal from the Chancery Court for Shelby County**
**No. CH-08-2172-3      Kenny Armstrong, Chancellor**

_____

**No. W2010-00848-COA-R3-PT - Filed October 6, 2010**

_____

This is a termination of parental rights case. The Department of Children's Services ("DCS") obtained custody of the child at issue under the terms of a protective custody order entered shortly after the child's birth. The juvenile court cited the mother's history with DCS and her history of mental illness as the primary reasons supporting removal. DCS developed two permanency plans with the mother designed to address her mental illness and equip her with the parental skills necessary to care for the child. The mother, however, did not carry out her responsibilities under the plans, take her medication as prescribed, or consistently attend critical mental health appointments. DCS accordingly petitioned to terminate the mother's parental rights on multiple grounds. After a hearing that the mother did not attend, the court terminated her parental rights on the grounds of abandonment by willful failure to provide financial support, substantial noncompliance with the responsibilities of the permanency plans, and persistence of the conditions that required the child's removal. The mother appeals, arguing that DCS did not make reasonable efforts to reunite her with the child and did not clearly and convincingly prove grounds for termination. We disagree and affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed
and Remanded**

DAVID R. FARMER, J., delivered the opinion of the Court, in which HOLLY M. KIRBY, J. and J. STEVEN STAFFORD, J., joined.

Cicely A. Dickerson, Memphis, Tennessee, for the appellant, Sharon T.A.

Robert E. Cooper, Jr., Attorney General and Reporter, Michael E. Moore, Solicitor General and Elizabeth C. Driver, Senior Counsel, for the appellee, State of Tennessee Department of Children's Services.

# OPINION

## I. Background and Procedural History

The respondent/appellant, Sharon T.A. ("Mother"), is a troubled young woman with a history of mental illness, including at least three inpatient hospitalizations at Lakeside Behavioral Health Systems ("Lakeside"). In 2005, doctors diagnosed Mother with a psychotic thought disorder, which included a differential diagnosis of paranoid schizophrenia, bipolar disorder, or schizo-affective disorder. DCS's expert witness, Dr. Michael Patterson, explained the differential diagnosis as follows:

[T]here are various types of psychiatric disorders. A differential diagnosis means that these are the possibilities more likely than not of what we are dealing with.

But in order to make a more precise diagnosis, you cannot diagnose, or at least you should not diagnose, a specific disorder in a cross-section with a single snap. We are looking for the longitudinal view, patterns or trends in order to establish a diagnosis of an illness such as schizophrenia, bipolar disorder, because they have overlapping features.

They are all in the group of psychotic disorders. There are certain features she presented with which obviously by definition represent psychosis, hearing voices, visual hallucinations, paranoid delusions, which she possessed. Also, there was a portion of her illness which was mood-related.

Therefore, we considered that primarily this was most likely a schizo-affective disorder. There was an affective component, however, we couldn't rule out bipolar disorder as well. It's sort of a broad category that incorporates all of the above that I have mentioned.

Dr. Patterson testified that Mother's disorder is serious and inevitably becomes symptomatic if untreated. According to Dr. Patterson, the positive symptoms of Mother's disorder include auditory hallucinations, paranoid delusions, and disconnections from reality. He testified that without proper medication and treatment Mother's symptoms can increase her propensity for violence and abuse, decrease her capacity to perceive rationally her environment, and diminish her ability to interact appropriately with others. Importantly, symptoms of Mother's illness can also severely affect her ability to care for herself and the child. As Dr. Patterson explained, if a person in Mother's condition is hearing voices or experiencing a false perception of reality, "there is really no way to predict what the child

-2-

represents to them in their mind. And there is an endangerment posed by that." Although Dr. Patterson believes Mother can potentially "reduce or slow the progression of the illness to a point where symptoms are manageable," management of her chronic, progressive disorder requires proper treatment and medication.

Mother, however, has never demonstrated an ability or willingness to manage her disorder on a consistent basis. Doctors, nurses, and mental health professionals have repeatedly stressed to Mother the importance of keeping her appointments and taking her medication as prescribed, beginning with her first admission to Lakeside in 2005 and continuing forward. Mother nonetheless has consistently failed to take her medication as prescribed, to attend her scheduled appointments on a consistent basis, and to follow through on the recommendations of medical professionals. For example, Mother was readmitted to Lakeside in 2005 because she was noncompliant with her outpatient follow-up and did not take her medication as prescribed. Dr. Patterson, who was also Mother's admitting physician at Lakeside, explained that she "essentially remained psychotic and got readmitted to the hospital."

Hospital employees were aware of Mother's history of mental illness, as well as her past history with DCS that resulted in the placement of two prior children with extended family, when she gave birth to her third child, Shanya A.A. ("Shanya"). As a result, DCS received a referral shortly after Shanya's birth citing Mother's history of mental illness, her history with DCS, and the corresponding substantial risk of physical injury to the child. DCS responded with a petition to adjudicate the child dependent and neglected, which stated that the pending threat to the child's safety required the entry of an immediate protective custody order. The juvenile court agreed and entered a protective custody order removing Shanya from Mother's care on February 27, 2007.

On March 14, 2007, DCS developed the first of two permanency plans for Mother. The first plan contained the dual goals of reunification with Mother or placement with relatives. Its desired outcomes included helping Mother develop the emotional stability and parental ability needed to care for the child, developing a relationship between Mother and the child, and ultimately placing the child in a stable home. The first plan required Mother to contact DCS regarding visitation, submit to a mental health assessment, and follow all recommendations of the mental health provider. Although there is minimal testimony describing DCS's effort to help Mother meet the requirements of the initial parenting plan, the record does reflect that DCS referred Mother for a behavioral health assessment and provided her visitation with the child during this period.

On August 27, 2007, Mother was again admitted to Lakeside after she was found wandering the streets in a confused and anxious state. Upon arrival, Mother was unable to

explain why she was at the hospital. Doctors described her as impulsive, easily agitated, confused, and experiencing auditory hallucinations to the extent she was a danger to herself. Due to her needs for immediate medication and assurance of safety, it was recommended that she receive inpatient treatment. Mother thereafter remained at Lakeside for one week, receiving a comprehensive psychosocial assessment, around-the-clock observation, group therapy, and medication management. On September 4, 2007, Lakeside discharged Mother after prescribing her daily medication, setting up a mental health follow-up with the Whitehaven Southwest Mental Health Center ("WSMHC"), and recommending further follow-up with Mother's primary care physician for any recurring medical issues. She was again instructed to keep her appointments with WSMHC. Mother, however, ultimately did not comply and was discharged from WSMHC for failure to attend scheduled appointments with her case manager.

The second permanency plan, which was entered on April 8, 2008, correspondingly focused on Mother's need to treat her mental disorder and expanded Mother's responsibilities under the plan. It required Mother to provide stable housing for the child, attend all mental health appointments, take her medication as prescribed, provide financial support for the child, attend parenting classes, and maintain contact with DCS. In response, DCS heightened its efforts to aid Mother. The Department again referred Mother to WSMHC for counseling and treatment, referred her to the UT Boling Center for Developmental Disabilities for parenting classes; provided her bus passes; and offered to help her find proper housing. Mother, on the other hand, largely neglected these opportunities. Ms. Gray, Mother's family services worker, testified that Mother did not comply with either permanency plan, participate in the requisite mental health case management services, or accept DCS's offer to find appropriate housing.

Mother also neglected her few opportunities to form a relationship with Shanya. DCS prepared and administered a visitation schedule for Mother and other family members following the creation of the second permanency plan, even though Mother never contacted DCS to schedule visitation. DCS scheduled six monthly visits for Mother beginning April 2008 which started at 1:00 p.m. and concluded at 5:00 p.m. Mother was consistently late to the few scheduled visits, arriving no earlier than 2:45 p.m. during the six-month period. Additionally, Ms. Gray testified that the only reason Mother attended the final scheduled visit in October, again appearing two-and-a-half hours late, was to borrow $20 from a family friend. Unsurprisingly, Mother did not bond very well with Shanya during these limited visits.

On November 21, 2008, DCS petitioned to terminate the parental rights of Mother and Unknown Father, noting that two putative fathers had filed waivers of interest and notice. The petition alleged the following grounds for termination with respect to Mother:

abandonment by failure to visit, abandonment by failure to support, substantial noncompliance, persistence of conditions, and mental incompetency. According to the petition, Mother had not maintained financial stability, followed the recommendations of her mental health assessment, maintained contact with DCS, attended her mental health appointments, participated in parenting classes, or taken her medication as prescribed. In relation to the child's best interests, the petition further alleged, among other things, that Mother had not made an adjustment of circumstances supporting reunification, maintained regular visitation, or paid child support.

The trial court conducted a final hearing on DCS's petition on August 18, 2009. The evidence before the court included testimony from Ms. Gray and Dr. Patterson, as well as records of Mother's hospitalizations and treatment. Mother did not appear at the hearing.[1] In light of the evidence before it, the trial court found that DCS had clearly and convincingly proved the grounds of abandonment by willful failure to support, persistence of conditions, and substantial noncompliance with the provisions of the permanency plans. The court, however, did not find clear and convincing evidence to support a finding of mental incompetency or abandonment by failure to visit. After concluding that termination of Mother's parental rights was in the best interests of the child, the court granted DCS's petition. Later, the court incorporated its findings into a detailed, written order dated September 11, 2009. Mother timely filed a notice of appeal.[2]

## II. Issues Presented

The issues before this Court, as we perceive them, are as follows:

(1)    Whether DCS expended reasonable efforts to reunite Mother with

---

[1]The record shows that Mother provided DCS with multiple addresses throughout the proceedings and it became difficult to locate her as the case progressed. At some point following the filing of DCS's termination petition, all contact with Mother ceased. Mother's attorney conceded in opening arguments that she had lost contact with Mother prior to the final hearing. Ms. Gray similarly testified that the last face-to-face conversation she had with Mother was at a permanency hearing in April 2009 and that her last phone conversation with Mother occurred in May or June 2009. Ms. Grady received a message from Mother in May 2009 attempting to provide DCS with a current address for a home study, but the message was unintelligible. In July 2009, DCS had no current or working telephone for Mother. The guardian ad litem ("GAL") appointed to represent Shanya further reported that Mother had disconnected her phones and could not be found at any of her listed addresses. The GAL's attempt to contact Mother at her last known address shortly before the final hearing was unsuccessful, even though neighbors reported seeing Mother that same day. The GAL left her contact information on Mother's door and with her neighbor, but mother never contacted her. Mother nonetheless resurfaced following the termination hearing and initiated this appeal.

[2]The court's order also terminated the parental rights of Unknown Father. No father has appealed.

Shanya;

    (2)    Whether DCS clearly and convincingly proved the ground of substantial noncompliance with the statements of responsibilities in the permanency plans;

    (3)    Whether DCS clearly and convincingly proved the ground of persistence of conditions; and

    (4)    Whether DCS clearly and convincingly proved that termination of Mother's parental rights was in the best interests of Shanya.[3]

DCS has waived any reliance on the ground of abandonment by willful failure to support in this appeal.

### III. Standard of Review

This Court reviews a trial court's findings of fact *de novo* upon the record, according a presumption of correctness to the findings unless a preponderance of the evidence is to the contrary. Tenn. R. App. P. 13(d). This Court will not reevaluate the factual determinations of a trial court hinging on credibility unless clear and convincing evidence is to the contrary. *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005) (citation omitted). This Court reviews the record *de novo* where the trial court has not made a specific finding of fact. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citation omitted). No presumption of correctness attaches to a trial court's conclusions of law. Tenn. R. App. P. 13(d); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).

Tennessee Code Annotated section 36-1-113 governs the termination of parental rights. The Code provides, in pertinent part:

    (c) Termination of parental or guardianship rights must be based upon:
    (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been

---

[3] Mother does not argue that the trial court incorrectly determined that termination of her parental rights was in the best interests of the child. We nevertheless find good cause to consider this issue on appeal. *See* Tenn. R. App. P. 2; Tenn. Ct. App. R. 1(b) (permitting suspension of the procedural rules requiring argument supported by authority and citations to the record for good cause); *accord In re I.R.J.*, No. M2009-00411-COA-R3-PT, 2009 WL 4017168, at *7, 17-19 (Tenn. Ct. App. Nov. 18, 2009) (*no perm. app. filed*) (citations omitted) (conducting a best-interests analysis even though the appellant did not raise the issue).

established; and

> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. § 36-1-113(c)(1), (2) (Supp. 2009). This two-step analysis requires courts to consider "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). "The 'clear and convincing evidence' standard is more exacting than the 'preponderance of the evidence' standard, although it does not demand the certainty required by the 'beyond a reasonable doubt' standard." *In re M.L.D.*, 182 S.W.3d at 894 (citation omitted). "To be clear and convincing, the evidence must eliminate any substantial doubt and produce in the fact-finder's mind a firm conviction as to the truth." *Id.* (citation omitted).

## IV. Analysis

### A. Reasonable Efforts

Mother first submits that DCS did not make reasonable efforts to reunite her with Shanya. As this Court has explained:

> Where the Department seeks to terminate parental rights on a ground that implicates the Department's obligation to use reasonable efforts to make it "possible for the child to return safely to the child's home," Tenn. Code Ann. §§ 37-1-166(a)(2), -166(g)(2), those reasonable efforts must be proved by clear and convincing evidence. *In re B.B.*, No. M2003-01234-COA-R3-PT, 2004 WL 1283983, at *9 (Tenn. Ct. App. June 9, 2004) (citing *In re C.M.M.*, 2004 WL 438326, at *7-8). Thus, the Department ha[s] the burden to prove by clear and convincing evidence that it exercised reasonable care and diligence to provide services reasonably necessary to meet Mother's needs to assist her to fulfill her obligations under the permanency plans. *In re Valentine*, 79 S.W.3d at 546; *In re C.M.M.*, 2004 WL 438326 at *8; Tenn. Code Ann. § 36-1-113(c). This burden require[s] that the Department present sufficient evidence to enable us to conclude, without serious or substantial doubt, that the efforts were reasonable under the circumstances. *In re Valentine*, 79 S.W.3d at 546; *In re C.D.B.*, 37 S.W.3d 925, 927 (Tenn. Ct. App. 2000); *see Walton v. Young*, 950 S.W.2d 956, 960 (Tenn. 1997).
>
> . . . .
>
> "The success of a parent's remedial efforts generally depends on the

Department's assistance and support." *In re Giorgianna H.*, 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006). Accordingly, the Department's employees have an affirmative duty to utilize their education and training to assist parents in a reasonable way to address the conditions that led to the child's removal and to complete the tasks stated in the plan. *In re Giorgianna H.*, 205 S.W.3d. at 519; *In re J.L.E.*, No. M2004-02133-COA-R3-PT, 2005 WL 1541862, at *14 (Tenn. Ct. App. June 30, 2005); *In re C.M.M.*, 2004 WL 438326, at *7; *In re D.D.V.*, No. M2001-02282-COA-R3-JV, 2002 WL 225891, at *8 (Tenn. Ct. App. Feb. 14, 2002). This duty exists even if the parent does not ask for assistance. *In re C.M.M.*, 2004 WL 438326, at *7. The importance of the Department's role in this regard has been emphasized by this court on numerous occasions. *In re B.L.C.*, No. M2007-01011-COA-R3-PT, 2007 WL 4322068, at *8 (Tenn. Ct. App. Dec. 6, 2007) (no Tenn. R. App. P. 11 application filed); *In re C.M.M.*, 2004 WL 438326, at *7 (stating that "[i]n many circumstances, the success of a parent's remedial efforts is intertwined with the efforts of the Department's staff to provide assistance and support"); *In re J.A.W.*, No. M2007-00756-COA-R3-PT, 2007 WL 3332853, at *4 (Tenn. Ct. App. Nov. 8, 2007); *In re Randall B., Jr.*, No. M2006-00055-COA-R3-PT, 2006 WL 2792158, at *5-6 (Tenn. Ct. App. Sept. 28, 2006).

Reasonable efforts are statutorily defined as the "exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family." Tenn. Code Ann. § 37-1-166(g)(1). The factors the courts are to use to determine reasonableness include: (1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the childrens [sic] removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Departments efforts. *In re Tiffany B.*, 228 S.W.3d 148, 158-59 (Tenn. Ct. App. 2007) (footnote omitted) (citing *In re Giorgianna H.*, 205 S.W.3d at 519).

*In re R.L.F.*, 278 S.W.3d 305, 315-17 (Tenn. Ct. App. 2008) (emphasis omitted). "More specific to the issue of a parent with known mental health deficiencies, we have repeatedly found that the Department's failure to provide needed psychological or psychiatric treatment constitutes a failure to exercise reasonable efforts." *Id.* at 318 (citations omitted).

Having reviewed the record, we find that DCS carried its burden under the

circumstances. DCS was required to expend reasonable efforts to reunite Mother with Shanya before terminating her parental rights on the grounds of substantial noncompliance and persistence of conditions. *See In re Tiffany B.*, 228 S.W.3d 148, 151, 160 (Tenn. Ct. App. 2007) (vacating a finding of abandonment, substantial noncompliance, and persistence of conditions for failure to make reasonable efforts); *see also In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 n.27 (Tenn. Ct. App. Mar. 9, 2004) (noting that termination based on grounds in Tennessee Code Annotated section 36-1-113(g)(1)-(3) generally requires reasonable efforts). The General Assembly, however, did not place the burden to reunify parent and child on DCS's shoulders alone. *See State, Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 801 (Tenn. Ct. App. 2008) (citation omitted). Reunification "is a two-way street, and neither law nor policy requires the Department to accomplish reunification on its own without the assistance of the parents." *In re Tiffany B.*, 228 S.W.3d at 159 (citations omitted). "Parents share the responsibility for addressing the conditions that led to the removal of their children from their custody." *Id.* "They must also make reasonable efforts to rehabilitate themselves once services have been made available to them." *Id.* (citations omitted). It is the opinion of this Court that the same holds true for parents with known mental health issues, although the determination of what is reasonable must vary with the degree of incapacity or illness.

In this case, any failure to make reasonable efforts lies with Mother.[4] The primary impediment to Mother's reunification with Shanya was her history of mental illness, including her repeated failures to obtain necessary treatment. DCS, recognizing this, attempted throughout these proceedings to provide Mother with the requisite evaluation, transportation, medication, counseling, and assistance to help her combat the progression of her disorder. Mother, however, consistently failed to take her medication on a regular basis, to attend appointments with her case managers on a regular basis, and to follow through on the recommendations of medical personnel.[5] Quite clearly, DCS could not control the most important factors to the treatment of Mother's disorder, and its duty to expend reasonable efforts did not encompass an obligation to administer medication by force or to compel physically her attendance at medical appointments. *See In re A.W.*, 114 S.W.3d 541, 546

---

[4] The only evidence in the record cited to show Mother's reasonable efforts subsequent to the removal of Shanya demonstrates that she filled out job applications with DCS's assistance. Additionally, DCS concedes on appeal that Mother attended some parenting classes.

[5] This is not a case where DCS simply provided the mother with a list of mental health providers and sent her on her way. The record shows that Mother received a mental health evaluation at Lakeside subsequent to the removal of Shanya and later obtained proper treatment and medication at WSMHC for a period. Soon thereafter, however, Mother was discharged from WSMHC for failure to attend appointments with her case manager.

(Tenn. Ct. App. 2003) ("We are unsure what additional services short of confinement, DCS could have supplied that would have helped the mother take her medication. . . . Therefore, we do not think DCS failed to make reasonable efforts to help the mother make the "lasting adjustment" that is required to avoid the termination of her parental rights."). We accordingly hold that DCS made reasonable efforts to reunite Mother with Shanya.

## *B. Grounds*

The next question before this Court is whether DCS clearly and convincingly proved grounds for termination. This Court will affirm a trial court's finding of grounds if DCS clearly and convincingly proved at least one of the statutory bases for termination. *State, Dep't of Children's Servs. v. Mims*, 285 S.W.3d 435, 449 (Tenn. Ct. App. 2008) (citation omitted). The grounds before this Court are substantial noncompliance with the statements of responsibilities in the permanency plans, *see* Tenn. Code Ann. § 36-1-113(g)(2) (Supp. 2009), and failure to remedy the conditions requiring the child's removal, *see* Tenn. Code Ann. § 36-1-113(g)(3) (Supp. 2009).

### i. Substantial Noncompliance

Tennessee Code Annotated section 36-1-113(g)(2) establishes a ground for termination if "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4." Tenn. Code Ann. § 36-1-113(g)(2). Termination for substantial noncompliance is warranted only when the plan's requirements are "'reasonable and related to remedying the conditions which necessitate foster care placement.'" *In re Valentine*, 79 S.W.3d at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). The determination of whether noncompliance is substantial compares the degree of noncompliance with the importance of the unmet obligation. *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004) (citations omitted). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *Id.* at 656-57 (citations omitted).

Mother argues principally that her plans' requirements were not reasonable and related to remedying the conditions that required Shanya's removal. Because the trial court did not address this issue, our review is *de novo*. *In re Valentine*, 79 S.W.3d at 547. Mother submits that the first plan's requirement that she obtain a mental health assessment was redundant and unnecessary, especially where DCS already had her medical records on file. She further submits that her second plan's requirement that she attend counseling at WSMHC was unreasonable because she had failed to make progress there in prior attempts. We disagree on both points. The principal impediment to Mother's reunification with the child was a

psychotic disorder which Dr. Patterson testified required additional monitoring before doctors could provide a complete diagnosis. Further, Dr. Patterson testified that Mother's disorder is progressive and will worsen without treatment. It was therefore entirely reasonable for DCS to require Mother to receive a current mental health assessment highlighting her current treatment needs. It was also reasonable to require Mother to reinitiate her treatment at WSMHC. Mother submits that "[o]bviously this plan was not working" and DCS should have established a new plan. But any failure on Mother's part to benefit from prior counseling at WSMHC is not a reflection on the quality of services provided; rather, it was Mother's refusal to attend her appointments that precluded progress. Mother has cited no testimony or other evidence to demonstrate that WSMHC's treatment program, which included counseling and medication management, was inappropriate. Having reviewed the record, we hold that the requirements of Mother's permanency plans were reasonable and related to addressing her mental health issues, providing her with the parenting skills necessary to care for the child, and establishing the stability needed to provide a healthy home for the child.

We further hold that DCS clearly and convincingly proved Mother's substantial noncompliance with the terms of her parenting plans. The only testimony in the record is that Mother did not fulfill a single parental responsibility of either plan. Mother did not appear at the hearing to refute this testimony and she does not argue on appeal that she substantially complied with the responsibilities of either plan. Instead, she limits her arguments to the reasonableness of the plans' requirements and the reasonableness of DCS's efforts. Having rejected these arguments above, we affirm the finding of substantial noncompliance. The record clearly and convincingly shows that Mother failed to contact DCS regarding visitation with the child, failed to follow the recommendations of the mental health providers, failed to attend critical mental health appointments, failed to take her medication as prescribed, and failed to maintain contact with DCS. These parental responsibilities were essential to reuniting Mother with Shanya and, therefore, her noncompliance was substantial.

### ii. Persistence of Conditions

We next address whether DCS clearly and convincingly proved the ground of persistence of conditions. Tennessee Code Annotated section 36-1-113(g)(3) establishes a ground for termination if:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
> > (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that,

therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A)-(C) (Supp. 2009). A finding of persistent conditions is permissible only if DCS presents clear and convincing evidence to establish each statutory element. *In re Giorgianna H.*, 205 S.W.3d at 518 (citation omitted).

We hold that DCS clearly and convincingly proved each element of this ground for termination. Dr. Patterson explained that treatment of Mother's disorder can prevent or slow its progression. He testified, however, that "without treatment, ongoing treatment, the likelihood that these episodes will occur is more often than not." Dr. Patterson further testified within a degree of medical certainty that Mother needs constant medical treatment and medication just to maintain some sort of stability; without it there is a likelihood that she will deteriorate. The record in this case demonstrates that Mother did not obtain the requisite treatment or medication on a regular basis. And her most recent hospitalization in 2007 appears to affirm Dr. Patterson's testimony. Mother's pattern of noncompliance is sufficient in our opinion to clearly and convincingly prove a persistence of the conditions that led to Shanya's removal. Mother's mental health issues and her failure to seek treatment to address her disorder persist; these conditions in all reasonable probability would cause the child to be subjected to further abuse or neglect and, therefore, prevent the child's safe return to the care of Mother; these conditions are unlikely to be remedied at an early date; and the continuation of the relationship between Mother and Shanya greatly diminishes the child's chances of early integration into a safe, stable, and permanent home. We affirm the trial court's finding on the ground of persistence of conditions.

### C. Best Interests

As a final matter, we consider whether termination of Mother's parental rights is in the best interests of Shanya. Courts should terminate the parent-child relationship only if clear and convincing evidence shows that termination is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c)(2). The General Assembly has established a non-exhaustive list of factors courts should consider when making a best-interests determination:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(1)-(9) (Supp. 2009).

The best interests of Shanya weigh heavily in favor of termination. Mother's unwillingness or inability to obtain treatment for what Dr. Patterson testified is a manageable mental disorder raises serious questions about her ability to provide a safe environment for herself and her child over the long term. In addition, Mother made no meaningful attempt to form a bond with the child, she rarely visited the child, and she exhibited next to no desire to raise the child. She failed to appear at the dependency and neglect hearing. She failed initially to respond to the termination petition. She failed to

maintain contact with DCS.  She failed to carry out her responsibilities under the permanency plans.  She failed to attend the termination hearing.  All of this occurred despite Mother's prior history with DCS, her purported desire to maintain custody, and DCS's explanation of the consequences of her inattention.[6]  In contrast, the record casts no doubt on the ability and desire of the potential adoptive parents to provide a stable and nurturing environment for the child.  It instead shows that the foster parents have continuously cared for Shanya since shortly after the child's birth and have established a strong rapport with the child.  We accordingly hold that the best interests of the Shanya support termination of Mother's parental rights.  The decision of the trial court is affirmed.

## V.  Conclusion

For the foregoing reasons, we affirm the trial court's decision to terminate Mother's parental rights on the grounds of substantial noncompliance and persistence of conditions.  Costs of this appeal are assessed to the appellant, Sharon T.A., for which execution may issue if necessary.

_____
DAVID R. FARMER, JUDGE

---

[6] The record shows that DCS provided Mother with a copy of the Criteria for Termination of Parental Rights and an explanation of its contents.