IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Submitted on Briefs January 17, 2014

## IN RE D.W.M., Jr.

**Appeal from the Juvenile Court of Bradley County**
**No. J-11-343    Daniel Swafford, Juvenile Judge**

**No. E2013-02017-COA-R3-PT-FILED-MAY 13, 2014**

This appeal involves termination of parental rights.  While she was pregnant, the mother of the child at issue made threats to harm herself and the unborn child.  Both of the parents are mentally impaired.  The mother has other serious disorders as well, and the father is a registered sex offender.  The state took the child into protective custody four days after the child was born.  The Tennessee Department of Children's Services filed a petition to terminate the parental rights of both parents on grounds of mental incompetence and persistent conditions. After a trial, the trial court found by clear and convincing evidence that the Department of Children's Services had established grounds for termination and that termination of parental rights was in the child's best interest.  Discerning no error, we affirm.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Affirmed**.

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J. W.S., and J. STEVEN STAFFORD, J., joined.

David K. Calfee, Cleveland, Tennessee, for Respondent/Appellant, D.W.M., Sr.

Sally C. Love, Cleveland, Tennessee, for Respondent/Appellant, J.A.B.

Robert E. Cooper, Jr. and Leslie Curry, Nashville, Tennessee, for Petitioner/Appellee, Tennessee Department of Children's Services

### OPINION

### FACTS AND PROCEEDINGS BELOW

The child at issue in this appeal, D.W.M., Jr., was born in August 2011 to parents D.W.M., Sr. ("Father") and J.A.B. ("Mother").  Both parents have significant challenges.

Mother suffers from mental and emotional infirmities, including mental retardation with narcissistic features, bipolar disorder, intermittent explosive disorder, and a seizure disorder. Father has been diagnosed with mental retardation as well and has an extensive criminal record, including fifteen years' incarceration for manslaughter and aggravated rape of a minor.

Prior to her pregnancy with the subject child, Mother was taking medication to control some of her conditions. Once she became pregnant, she stopped taking the medicine.[1] Without the medication to control her conditions, Mother stopped cooperating with healthcare providers and began making alarming threats to harm herself and the unborn child. Months before the due date, Mother began insisting that healthcare providers deliver the child immediately. She became increasingly menacing; if healthcare providers would not accede to her demand that they immediately deliver the baby, Mother threatened, she would drown herself and the unborn child, take pills to induce labor or terminate the pregnancy, or even cut open her stomach and pull the child out. Not surprisingly, Mother's healthcare providers became concerned that she would harm herself or the unborn child, so they admitted Mother to the hospital as a high-risk pregnancy and delivered the child three weeks before the due date.

The hospital to which Mother was admitted alerted the Tennessee Department of Children's Services (DCS) to Mother's situation. While Mother was in the hospital, DCS conducted an investigation which included an inspection of the home the parents shared. The home was unclean, had clutter to such an extent that it indicated possible hoarding, and was infested with bugs. Hospital personnel told DCS investigators that, more than once, Mother forgot to feed her newborn infant at a time when a feeding was scheduled. They also told DCS that both parents exhibited a "severe lack of understanding of what is needed to keep a newborn healthy."

Based on its investigation, DCS filed a dependency and neglect petition in the Juvenile Court of Bradley County, Tennessee. Four days after the child was born, DCS removed the baby from his parents' custody and placed him in foster care. On August 18, 2011, the Juvenile Court held a hearing on the DCS petition. Subsequently, the Juvenile Court entered an order declaring the child to be dependent and neglected.

In the wake of the dependency and neglect order, Mother and Father were appointed separate counsel. DCS staffed a permanency plan for the child with dual goals of adoption or reunification. Among other things, the permanency plan required the parents to maintain

---

[1]Mother later testified that she stopped taking her medication upon the advice of her physician because the medicine could adversely affect her unborn child.

suitable housing, attend parenting classes, comply with mental health treatment, and have regular supervised therapeutic parenting time with the child.

Pursuant to the parenting plan, both parents attended weekly therapeutic parenting time with their child, completed parenting classes, and generally took their prescribed medications as scheduled. They also rented a home from a relative. Mental health parenting assessments were performed as to both parents.

Ultimately, DCS concluded that neither Mother nor Father were capable of caring for their child. In June 2012, DCS filed a petition in the Bradley County Juvenile Court to terminate the parental rights of both Mother and Father. The petition alleged grounds of mental incompetence and persistent conditions.

In June 2013, the trial was conducted on the DCS petition to terminate the parental rights of both Mother and Father. The trial court heard testimony from numerous witnesses, including the DCS caseworker who supervised the therapeutic parenting time, the foster parent, and also heard expert testimony on the parents' mental health parenting assessments. Mother and the maternal grandmother testified at the trial. Father was present and represented by counsel, but he chose not to testify.

Mother's mental health parenting assessment was performed by Alice Greaves, Psy.D., a psychological examiner and therapist. Dr. Greaves testified about her December 2011 clinical interview with Mother and the testing she performed. Dr. Greaves said that Mother brought her own mother to the clinical interview, to help Mother answer Dr. Greaves' questions. Before the interview, Dr. Greaves had planned to give Mother a series of psychological tests, but once Dr. Greaves met Mother, she decided to instead give Mother only an IQ and achievement test. Dr. Greaves explained why she changed her initial plan: "[I]t was very clear that [Mother] would not have been able to give — produce valid profiles on the testing . . . . Her level of cognitive ability was below the reading level of any of the tests that I would have given her. And she also demonstrated . . . difficulty understanding many of the terms that were used."

In her testimony, Dr. Greaves described the results from the tests she gave Mother:

> [Mother's] general IQ was 54, which is at the very low end, the very bottom end of the mildly mentally retarded range. And that range for that score, generally people end up functioning cognitively with the range of an 8-to-11 year old. Occasionally, people with an IQ in that range can raise children, but only if they have a support person who is present in the home at all times, who is very capable, and to whom the person will listen without argument and

fighting, and so on, about what to do. So independently caring for a child isn't possible.

Mother's reading comprehension and math computation ability are both at the approximate level of a first or second grader. Dr. Greaves said that the minimum reading ability required, that is, the lowest range to function independently, is a fifth grade reading level. Mother's test results, Dr. Greaves concluded, showed that "[i]t would be impossible for [Mother] to keep up with her own bills, or be aware of how much money she had. And basic accounting, because she can't subtract, and her addition skills are very poor." She said that Mother is unable to comprehend warning signs with which she is not familiar and is not able to read a warning or an explanation of danger. In addition to her other challenges, Dr. Greaves said, Mother is "very easily distracted" and "could not focus her attention for more than a few minutes at a time."

Dr. Greaves was also greatly concerned by Mother's typical response when she is told that she is incorrect about something she believes to be true. In that situation, Dr. Greaves said, Mother is likely to lose her temper at being contradicted, does not understand the explanation given to her, and cannot grasp where things fit in the bigger picture. Dr. Greaves explained that, while Mother may understand a single event or skill, she cannot comprehend how the single event or skill relates to everything else. For example, she said, Mother may understand when it is time for a baby to eat but cannot estimate time spans or remember to look at a clock to see when it is time for another feeding. Mother may understand that a baby needs a lot of attention, Dr. Greaves said, but if Mother "has some needs or wants that are present at the same time, she would naturally try to fulfill her own needs first, rather than the baby's." Dr. Greaves opined that Mother is unable to give a child regularly prescribed medication, get a child to school on time, or tell a child that it is time to go to bed. Asked whether family members or government agencies could help Mother care for the child, Dr. Greaves allowed, "I suppose it's within the realm of possibility," but added that Mother's intermittent explosive disorder would likely scuttle attempts to assist her.

Additional tests Dr. Greaves administered to Mother indicated that she has inadequate boundaries, lacks control when faced with problems, is unable to remain calm when confronted with unexpected events, and is very poor at resolving conflicts. Dr. Greaves said that Mother is "very focused on her own needs and has trouble putting her needs aside in order to accomplish important necessary things. That's particularly true if – if her emotions are involved . . . . [O]nce her emotions are involved, it's going to take a while to calm her down." Even if Mother had a higher intelligence level, Dr. Greaves said, her emotional impairments would present a "big problem" in parenting a child of any age. Dr. Greaves was also troubled by Mother's seizure disorder, given Mother's history of refusing to take her seizure medication.

-4-

Dr. Greaves acknowledged that Mother loves her child and clearly wants to be able to care for him. Nevertheless, when asked if anything could be done to resolve Mother's problems in the future, Dr. Greaves said, "there isn't really any way that it could."

Father's parenting assessment and psychosexual examination was performed by Bertin Glennon, Ph.D., a senior psychological examiner and marriage and family therapist. Though Father was cooperative, Dr. Glennon observed that he had "difficulty in the clinical interview, understanding some of the questions." Dr. Glennon said that Father "was very easily confused, he had difficulty at times orienting himself," and when Father did not understand a question he "would kind of go off tangentially to some – some other thing." Consequently, as Dr. Greaves had decided in her assessment of Mother, Dr. Glennon concluded that certain tests typically done in a parental assessment would be futile with Father. In lieu of the traditional parenting assessment tests, Dr. Glennon utilized general intelligence and functional ability tests.

The intelligence and functional ability tests Dr. Glennon administered to Father indicated that his IQ is 51; this placed Father in the moderately retarded range. Dr. Glennon explained that persons with an IQ of 51 can typically only attain a competency grade level of approximately the second grade. They can usually learn minor tasks if they are repetitive, but their judgment is inadequate and they need constant supervision. Dr. Glennon said that it would not be unusual for a person with this IQ to be able to maintain a clean and suitable residence. However, a person with an IQ of 51 would have considerable difficulty making parenting decisions for a young child.

In the testing with Dr. Glennon, Father had little recollection or comprehension of processes or incidents that occurred in the past. For example, Dr. Glennon said, Father could not recall why the subject child was taken away from him and Mother, could not remember what crimes he committed in the past, did not know that he is on the sex offender registry, and did not even understand what a sex offender registry is.

In light of Father's prior sex offense, Dr. Glennon also administered a psychosexual examination. Dr. Glennon said that the result of the test indicated a low risk that Father would sexually abuse his child; he estimated a recidivism rate between 5.3% and 7.7%.

Dr. Glennon testified that Father did not appear to suffer from any mental illness other than anxiety. Dr. Glennon commented that sometimes persons who do not understand what is going on around them get anxious, especially in an office setting. Dr. Glennon did not believe that Father's anxiety would adversely affect his parenting ability. He noted that Father had in the past grappled with alcohol and substance abuse, but that Father had quit

such substance abuse. If Father were to resume any substance abuse, Dr. Glennon said, it would further impair his ability to parent a child.

Although Father wants to be involved in his son's life, Dr. Glennon testified, if the child were returned to Father's custody, "controlling supervision" for 24-hours-a-day, every day would definitely be necessary, since Father cannot safely parent a child on his own. If Father partnered with a person of similar intellectual limitations, Dr. Glennon said, it would not be possible for them to function well or support a child. Overall, Dr. Glennon opined that a person with Father's limitations would have a very difficult time parenting a young child, given his inability to handle "pretty basic concerns about . . . how you're going to remember a doctor's appointment, and . . . things that a child needs regularly, if this basic part of your life [the ability to remember and understand things] just kind of stopped." Dr. Glennon observed that the limitations on Father's ability to parent a child are not likely to resolve or improve. The trial court also heard testimony from Amy Taylor, a counselor with Family Menders, a contract agency for families involved with the State. Ms. Taylor testified that she had supervised the therapeutic visitation for this family since the child was removed from the parents' custody in August 2011. She described both parents as "very consistent" in attending their 1-2 hour weekly visits with the child and commented that it was obvious that they both love their child.

Ms. Taylor testified about her observations regarding both Mother and Father. She said that Mother is very interactive with the child and will get down on the floor to play with him. However, Ms. Taylor had "grave concerns" about Mother's ability to regulate her emotions. When Mother is corrected, Ms. Taylor explained, her temper "flare[s] up" and she becomes angry to the point of inappropriate behavior and unhealthy interaction with the child. Ms. Taylor said that, on one occasion, even after Mother was repeatedly warned to calm down, Mother had to be removed from the visitation room, in front of the child. Ms. Taylor testified that Mother has threatened her, threatened to steal someone else's child, and threatened to bomb DCS.[2] Because of these threats, she said, Mother was told not to bring opaque bags to the visits. Mother violated this prohibition several times and then became angry at being told not to bring the opaque bag into the visit room. Even if Mother had 24-hour-a-day supervision by a competent adult, Ms. Taylor doubted that the child would be safe in Mother's custody because "she would not listen to the person doing the supervision."

As to Father, Ms. Taylor testified that Father is interested in the child and sometimes interacted with him but was "usually sitting back on the couch" during visits. She said that

---

[2]Ms. Taylor said that Mother's mother often accompanied Mother and Father to the visits with the child. She testified that she had heard Mother threaten her mother; the threats often referred to abuse, neglect, substance abuse, and the like.

Father's parenting skills had progressed very little from week to week, and he seldom implemented parenting skills he learned the prior week. In the course of her supervision of the visits, Ms. Taylor noted, she had never had to redirect Father or tell him that something he was doing was inappropriate. However, she was troubled by the fact that, when Mother behaved inappropriately or her anger escalated, Father did not intervene. Ms. Taylor observed, "He'll sit back and usually ignore it." Ms. Taylor noted that Father interacted with the child more on the occasion when Mother was removed from the visiting room and added that it was fair to say that Mother wants to be the center of attention for the child.

When the child tried to walk or crawl during visits, Mother and Father tended to try to hold the child back instead of encouraging him to try. Despite Ms. Taylor's instructions to the parents, she testified, the child "was walking on his own before they allowed him to walk on his own." She said that Mother has strong opinions on certain topics and will not take professional advice. For example, Ms. Taylor described an incident in which Mother became angry because the child had switched from a bottle to a sippy cup and began eating baby food; Mother did not want the child doing those things until he reached three years old. When Ms. Taylor explained that they were necessary for the child's growth, Mother responded that she did not care because that was what she wanted.

Ms. Taylor testified that she often had to remind Mother and Father about parenting instructions they had received in past visits. She said that she had seen no forward progression in their parenting skills from visit to visit. Given Mother's inability to regulate her emotions and Father's limited interaction with the child in Mother's presence, Ms. Taylor saw no benefit to giving the parents more time to develop their parenting skills.

The trial court heard testimony from the child's foster mother as well. She said that, at the time of trial, the child was 22 months old and meeting all normal developmental milestones. She confirmed that she has cared for the child since he was four days old. The foster mother said that her family treats the child as their own, the child calls her "mom" and has bonded with her family, and her family is interested in adopting the child should he become available for adoption.

The trial court also considered the testimony of David Griffith, the DCS social worker who was assigned to the case when the child was born. Mr. Griffith testified about the circumstances surrounding the child's birth and Mother's threats to harm herself and the unborn child. He outlined the requirements in the DCS permanency plan. He said that, in general, both parents complied with the plan requirements; they attended the required parenting classes, followed the mental health recommendations, maintained regular visitation with the child, and paid child support.

Since the initial DCS investigation, Mr. Griffith said, Mother and Father began renting a small home from a relative. Griffith visited the home in March 2012, not long after Mother and Father moved into it. He described the home at that time as "excellent," clean and "tidy," with a baby's room across from the kitchen. At that visit, Mr. Griffith felt that the home would be appropriate for the child.

The picture later changed. In June 2013, Mr. Griffith made an unannounced return visit and found the home in a much different condition than in the March 2012 visit. Mr. Griffith testified that the house was quite cluttered, with the baby's crib disassembled and lots of items stacked in the baby's room. The kitchen and bathroom were not just cluttered but "dirty," with paint cans on the floor as though Mother and Father had been planning to paint. Mr. Griffith described the clutter in the home as "a hoarding-type situation." After that visit, Mr. Griffith believed that the home would be a safety hazard for a child and he did not feel at all comfortable even allowing visits in the home.

Overall, Mr. Griffith said, he had not seen any forward moving or positive changes  on the parents' behalf that would cause him to recommend that the court return custody to them. He did not believe that the parents were any closer to being ready to assume custody of the child than they were when he was removed in August 2011. Asked whether termination of parental rights was in the child's best interest, Mr. Griffith responded:

> Currently, the same situation that was there two years ago is consistent, it's still there, it's still prevalent. The issues that have been addressed to the Court . . . continue to show me the same thing, with regards to their skills. Could they actually safely be a safe parent for this little child[?]. . . [N]o.

Mr. Griffith saw no less drastic alternative to termination of parental rights in order for the child to have a permanent and stable environment.

The trial court also heard testimony from Mother's mother ("Grandmother"). Grandmother testified that she had been appointed as Mother's conservator; she handles Mother's financial matters and assists her with all important decisions. She said that Mother is able to read, dress herself, comb her hair, and grocery shop and purchase food for herself, but she has trouble handling money and making change. Grandmother checks in with Mother or calls her every day to make sure she has taken her medication. She somewhat reluctantly conceded that Mother's and Father's home is cluttered. She gave little heed to Mother's threats to DCS or her threats during her pregnancy; Grandmother characterized the threats as maybe "just a joke" and commented that Mother "gets a little, well, kind of frustrated." Grandmother acknowledged that Mother will blow up at her when Grandmother tries to tell Mother "this is right or this is wrong."

Grandmother testified that she loves her grandson and that she and her husband will take care of Mother as long as they are living. Grandmother said that she and her husband are only a few minutes away from Mother's and Father's home and added, "If I have to, I'll move in with them."

Finally, Mother testified. She explained that she stopped taking certain medicines when she became pregnant because her doctors were concerned about birth defects. Mother acknowledged that she made threats during her pregnancy but insisted that she would not have hurt her child.

Mother testified that she and Father are married and live together in the house that they moved into in January 2012. She claimed repeatedly that she and Father work together as a team to maintain the home; Father pays the rent and Mother pays utilities and other expenses. She attributed the clutter Mr. Griffith described in his testimony to other people bringing things to their home. Since that visit, Mother said, she and Father had picked up and cleaned the bathroom, bedroom, and the dirty clothes. She acknowledged, however, that at the time of trial, their house was "not exactly" a safe place for a child to live.

In her testimony, Mother noted that she completed parenting classes and that she regularly visited the child. In therapy, she said, she had been working on remaining calm when she became angry by listening to music, turning on the television or working on her laptop.

Mother acknowledged that, to take care of their child, she and Father would need help:

> Q: Are you telling the Court that you're capable of taking care of [the child] completely by yourself?
> A: I couldn't take care of him. I know my mom will take– take a step, and help me out some. Yes, she can help me.
> Q: Okay. My question is, can you take care of [the child] yourself, without your mother's help, without anybody's help?
> A: A little bit, I – most I can, but the rest of it, I can't.
> Q: Okay. So it's fair to say without a competent adult to help you, you can't take care of this child?
> A: But most like – like I could take care of him, but the other half. Like the appointments. Like –
> Q: Like medical appointments?
> A: Yes.
> Q: You couldn't do that by yourself could you?
> A: Huh-uh. I have to call her to write it all down.

Q: And taking care of money, taking care of your money in the bank, you need somebody's help, don't you?
A: Yes.
Q: And remembering to take your medicine, you have to have somebody remind you of that, don't you?
A: A little bit. The most of it, I got a way to take it.
Q: Okay.

. . .

Q: Okay. And without your mother, if something were to happen to your mother, would you need some other adult to help you in your day-to-day life?
A: If something happened to my mother, I would have my father or my nana come in.
Q: Okay. But one of them would have to help you.
A: Yes.
Q: Is that right?
A. Yes.
Q: All right. So on your own, you can't function, but with someone else you can.
A: Yes.

. . .

Q: And that's always going to be the case, isn't that right?
A: Yes.

Mother's testimony concluded the trial. The trial court took the case under advisement.

In August 2013, the trial court entered an order terminating the parental rights of both Mother and Father. It first concluded that DCS had used reasonable efforts to assist the parents and reunite the family. The trial court recounted the evidence on DCS's efforts, including mental health parenting assessments, parenting instruction, and therapeutic supervised visitation. The trial court then addressed the grounds alleged by DCS in its termination petition, namely, mental incompetence under Tennessee Code Annotated § 36-1-113(g)(8)(B) and persistent conditions under Tennessee Code Annotated § 36-1-113(g)(3).

In it order, the trial court recounted the evidence on mental incompetence, emphasizing the testimony of Dr. Greaves and Dr. Glennon that, given both parents' diminished intellectual capacity, neither are capable of taking care of a child. The trial court recited Dr. Greaves' testimony that Mother's explosive temper prevents her from safely parenting the child even with constant supervision by a competent adult. It also pointed to Dr. Glennon's testimony that, even with "controlling supervision" Father would have a "difficult time parenting a child," and will never be able to safely care for a child on his own. The trial court found that

this "strong and uncontradicted" evidence demonstrated that Mother and Father "are simply incapable of being mentally rehabilitated" and "no amount of effort on the part of [DCS] . . . could make a difference in [their] mental condition." Consequently, the trial court held that DCS had established the ground of mental incompetence by clear and convincing evidence as to both Mother and Father.

The trial court's order also recited the evidence on the ground of persistent conditions. It noted that the child had been removed from the parents' home for at least six months. It reiterated that both of the mental health professionals who evaluated the parents concluded that there is little or no chance that either parent's mental incompetence will ever improve to the point that they can care for their child. The trial court noted that the evidence showed that, prior to each scheduled visit, both parents have to be reminded of proper parenting skills and both still require adult supervision while interacting with their child. The trial court also referenced the testimony on the state of the parents' home. It held that DCS had also established the ground of persistent conditions by clear and convincing evidence.

The trial court's order then addressed the best interest of the child. After reciting the best interest factors set forth in Tennessee Code Annotated § 36-6-113(i), the trial court made findings of fact as to each of the enumerated factors:

> (i) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

> > 2. The record indicates that based on the testimony of Alice Greaves, Psy. D. and Dr. Bertin Glennon, Ph.D. that neither Respondent has made or is likely to make in the near future an adjustment in their mental illness that would make it safe and in the child's best interest to be in the home of the parents. Ms. Taylor, who supervises the Respondents with the child, testified that [Mother's] outbursts of anger and threatening statements towards others concerned her in regards to [Mother's] ability to control herself, much less her ability to care for a child. Additionally, Ms. Taylor was also concerned regarding [Father's] lack of interaction with the child as well as his lack of intervention when [Mother's] behavior escalates to an unhealthy level while in the child's presence.

-11-

(ii) Whether the parent or guardian has failed to affect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

> 3. Here, Dr. Greaves and Dr. Glennon's testimony was such that even despite therapeutic visitation and assistance with parenting skills, that neither parents' mental illness is likely to change. Based on said professional assessment, a lasting adjustment does not reasonably appear possible in this case.

(iii) Whether the parent or guardian has maintained regular visitation or other contact with the child;

> 4. Testimony was that the mother and father did visit with the child regularly; however, testimony was that visitation had to be supervised and the parents had to be redirected continuously on how to appropriately interact with the child during visitation.

(iv) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

> 5. Here the child [has been] separated from the Respondents since he was four (4) days old. The Respondents have maintained a one hour supervised visitation schedule per week. However, it is not likely that this amount of time or this type of supervised interaction spent with the child has allowed a meaningful relationship to develop between the child and the parents.

(v) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

> 6. The child in this case has been with the foster family since he was four (4) days old, and he is now twenty-two (22) months old. The foster mother . . . testified that she and her family treat him as their own child. Her own children treat him as their brother. This is the only family this child has known and changing this child's caretakers and physical environment at this point is likely to have a negative impact on the child's emotional and psychological condition.

(vi) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional, or psychological abuse, or neglect toward the child or another child or adult in the family or household;

> 7. The record reflects that the father is a registered sex offender for a conviction of sexually assaulting a six year old child, and he is listed on the sex offender's registry as a violent offender. The mother has Intermittent Explosive Disorder, and has shown very inappropriate behavior around the child.

(vii) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe stable manner;

> 8. Here, the case worker, Dave Griffith, testified that at one time the Respondents moved to a new home which was in great condition. The Respondents' home was clean, free from clutter, and the child had his own room with a crib and other baby necessities. However, after the parents had been there for an amount of time the case worker revisited the home and found that the home is now dirty, cluttered, and [altogether] not a suitable healthy or safe physical environment for the child.

(viii) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child;

> 9. [Mother] currently is not able to tend to her own financial or health care needs by virtue of her mental illness. Her mother has a court ordered conservatorship in order to take care of her. [Mother] needs assistance in purchasing groceries, making change, taking medications, paying bills and other aspects of her care. A child is fully dependent on a parent being able to diagnose and treat incidents such as fevers, falls, bumps and other common childhood illnesses which require the ability to administer medications and appropriate dosages of medication

correctly. Since [Mother] is unable to tend to these vital areas of her own care, it is easily deduced that [Mother's] mental illness is to such a degree that she is unable to effectively perform or provide said vital activities on behalf of the child. Therefore, [Mother] is not capable of providing safe and stable care and supervision for the child.

10. [Father] has a mental retardation diagnosis and testimony of Dr. Glennon indicates that his mental illness would be detrimental to the child and would prevent him from effectively providing safe and stable care and supervision for the child.

(ix) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to 36-5-101.

11. The record demonstrates that the Respondent has been paying child support.

12. Analyzing the testimony in this case from the viewpoint of the child and not the outlook of the Respondents, it is apparent that in the cumulative, more factors than not for best interest of the child have been proven.

Thus, the trial court held that DCS had established by clear and convincing evidence that termination of both parents' parental rights served the child's best interests. Accordingly, it terminated the parental rights of both Mother and Father. From this order, both parents appeal.

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, both parents challenge whether DCS met its burden of proving by clear and convincing evidence the grounds of mental incompetence and persistent conditions and that termination of each parent's parental rights is in the child's best interest.

Termination proceedings are governed by statute in Tennessee. A party with standing to seek the termination of the parental rights of a biological parent must first prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1)(2013). Second, the party who seeks termination must prove that termination of the parental rights of the biological parent is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

-14-

Because of the profound consequences of a decision to terminate parental rights, courts must apply a higher standard of proof. Therefore, the elements required for termination of parental rights must be proven by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1); *In re Adoption of A.M.H.,* 215 S.W.3d 793, 809 (Tenn. 2007); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re Askia K. B.*, No. W2010-02496-COA-R3-PT, 2011 WL 4634241, at *7; 2011 Tenn. App. LEXIS 549, at *21 (Tenn. Ct. App. Oct. 7, 2011). The heightened burden of proof in cases involving the termination of parental rights serves to minimize the risk of an erroneous decision. *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

Evidence that meets the clear and convincing evidence standard "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Askia K. B.*, 2011 WL 4634241, at *7, 2011 Tenn. App. LEXIS 549, at *21; *In re A.T.P.*, No. M2006-02697-COA-R3-JV, 2008 WL 115538, at *4; 2008 Tenn. App. LEXIS 10, at *13-14 (Tenn. Ct. App. Jan.10, 2008) (citing *In re Valentine*, 79 S.W.3d at 546; *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9; 2003 Tenn. App. LEXIS 569, at *26 (Tenn. Ct. App. Aug. 13, 2003)). "In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is 'highly probable' as opposed to merely 'more probable than not.' " *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005) (quoting *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000)).

Because of the clear and convincing evidence burden of proof in parental termination cases, appellate courts adapt the customary standard of review set forth in Rule 13(d) of the Tennessee Rules of Appellate Procedure. *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007); *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). First, the trial court's specific factual findings are reviewed *de novo* in accordance with Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Tiffany B.*, 228 S.W.3d at 156; Tenn. R. App. P. 13(d) (2013). When the trial court's factual finding is based on the assessment of a witness's credibility, this Court will afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *In re M.L.D.*, 182 S.W.3d 890, 897 (Tenn. Ct. App. 2005). Second, the appellate court must decide whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements required to terminate a biological parent's parental rights. *In re Audrey S.*, 182 S.W.3d at 861; *In re Askia K. B.*, 2011 WL 4634241, at *7; 2011 Tenn. App. LEXIS 549, at *22. The trial court's conclusions of law are reviewed *de novo* with no presumption of correctness. *See In re the Adoption of A.M.H.*, 215 S.W.3d at 809; *In re Tiffany B.*, 228 S.W.3d at 156.

ANALYSIS

A biological parent's right to the care and the custody of his child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65; 120 S. Ct. 2054, 2060 (2000); *In re Adoption of A.M.H.*, 215 S.W.3d at 809; *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *In re Giorgianna H*., 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006). While this right is fundamental and superior to the claims of other persons, it is not absolute. *In re Giorgianna H.*, 205 S.W.3d at 515 (citing *DCS v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004)). It continues without interruption only so long as the parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope,* 77 S.W.3d 137, 141 (Tenn. 2002); *In re M.J.B.*, 140 S.W.3d at 653.

As noted above, Tennessee statutes require the party who seeks to terminate the parental rights of a biological parent to prove by clear and convincing evidence both the grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c). In this appeal, Mother and Father each separately challenge the trial court's findings of grounds for termination of their parental rights and whether termination of each parent's parental rights is in the child's best interest. We address grounds first and then best interest.

## Grounds

The trial court found that Mother and Father are both "mentally incompetent" to provide for the care and supervision of their child. The statute provides that parental rights may be terminated if the court finds by clear and convincing evidence that "the parent's . . . mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent . . . will be able to assume or resume the care of and responsibility for the child in the near future. . . ." Tenn. Code Ann. § 36-1-113(g)(8)(B).[3] The statute explicitly states that, for this ground, "no willfulness" on the part of the parent "need be shown to establish that the parental . . . rights should be terminated. . . ." Tenn. Code Ann. § 36-1-113(g)(8)(c).

---

[3]This ground states:

> (i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future[.]

Tenn. Code Ann. § 36-1-113(g)(8)(B)(i).

The mental incompetence of the parents was also relied on by the trial court to support the separate ground typically referred to as "persistent conditions"; that the child had been removed from the parents' home for at least six months; that "the conditions which led to the child's removal . . . still persist"; that there is "little likelihood that these conditions will be remedied at an early date. . ."; and that the continuation of the parent/child relationship "greatly diminishes the child's chances of early integration into a safe, stable and permanent home." Tenn. Code Ann. § 36-1-113(g)(3).[4] Consequently, we consider these two grounds together.[5] *See State Dep't of Children's Servs. v. Mims*, 285 S.W.3d 435, 448 (Tenn. Ct. App. 2008); *State Dep't of Children's Servs v. Oliver,* No. M2007-00844-COA-R3-PT, 2007 WL 4553036, at *8 (Tenn. Ct. App. Dec. 26, 2007).

On appeal, Mother argues that the only evidence offered as to her mental competence was the testimony of Dr. Greaves, which she contends did not rise to the level of clear and convincing evidence. Mother points out that Dr. Greaves did not observe her with the child, and she argues that the limited visitation Mother had with the child was not sufficient for her

---

[4] This statute states:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
>> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
>> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
>> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3) (2013).

[5] "Reasonable efforts need not be shown . . . if the termination of parental rights is based on the parent's impaired mental capacity." *Mims*, 285 S.W.3d at 449 (citing *In re C.M.M.,* No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *6 & n. 20 (Tenn. Ct. App. Mar. 9, 2004). In this case, the grounds are both mental incompetence and persistent conditions. Ordinarily, the ground of persistent conditions requires a showing that DCS made reasonable efforts to reunite the child with his parent. Tenn. Code Ann. § 37-1-166. However, in this case, the basis for the finding of persistent conditions is the parents' mental incompetence. Consequently, a showing of reasonable efforts by DCS is not required for either ground in this case, so we do not address the proof or the trial court's finding on reasonable efforts. We note also that reasonable efforts is not raised as an issue on appeal.

to learn parenting skills. Mother argues that the tests administered to her only measured intelligence and were insufficient to gauge her ability to parent a child. Mother notes that she had enough intelligence "to keep the appointment for the assessment by Dr. Greaves, to visit the child regularly, to take the parenting classes, [to] pay child support, to see her doctors, to take medication regularly, and to keep the residence in good condition for a significant a period of time." She contends that the record does not contain clear and convincing evidence of grounds for termination of her parental rights.

Father contends that the trial court based its finding on his mental competence and parenting ability solely on Dr. Glennon's testimony; like Mother, he argues that this did not rise to the level of clear and convincing evidence. Father notes that he met with Dr. Glennon only one time, and the clinical interview and testing performed in this single meeting was the sole basis for Dr. Glennon's conclusions. Father also challenges the testing because it measured intelligence, not the ability to raise a child. Like Mother, Father points out that Dr. Glennon did not observe Father's interaction with his child, nor did he observe Mother and Father interacting with the child together. Father emphasizes that the psychosexual testing Dr. Glennon performed indicated that Father does not pose a significant risk of sexual abuse. While the testimony of caseworker Taylor was critical of Mother, Father argues, Taylor testified that she never saw Father have an emotional outburst and never had to redirect Father; she only had to remind him to engage with the child.

As noted by Mother and Father, the trial court credited the parenting assessments performed by Dr. Greaves and Dr. Glennon, finding their opinions to be "strong and uncontradicted." On appeal, we give great deference to the trial court's credibility determination on these expert witnesses. *In re M.L.D.*, 182 S.W.3d at 897.

The appellate record in this case includes much evidence establishing the mental incompetence of both Mother and Father, and their inability to care for the child's needs. The proof showed that both experts administered tests to measure the parents' intellect, as opposed to parenting ability, only because the cognitive ability of both parents was insufficient to understand the questions in the parenting tests. Dr. Greaves said that Mother "demonstrated . . . difficulty understanding many of the terms that were used." She testified that Mother cannot grasp where things fit in the bigger picture so as to understand or remember the intervals at which a baby must be fed, is narcissistic and unable to put a child's needs above her own, would not be able to give a child medicine as prescribed, get a child to school on time, or know when to tell a child to go to bed. Dr. Glennon testified that Father was "very easily confused" in the clinical interview; he was unable to stay on track and would simply go off on a tangent when he did not understand the question. Dr. Glennon said that Father had so little recollection and comprehension that he did not understand why the child was taken away from him and Mother or remember the sex offense he committed in the

past. Both parents tested as mentally retarded; neither tested above the level of a second grade child and both had so little math skill and reading comprehension that they were unable to take care of their own needs, much less those of a small child. The testimony of both experts established that neither Mother nor Father have the cognitive resources or life skills necessary to provide for the care and supervision of a child.

The expert parenting assessments in this case are corroborated by the observations of the caseworkers who interacted with the family. Ms. Taylor described how Mother's intermittent explosive disorder prevented her from accepting much-needed parenting instruction, and that Father was largely disengaged during visits and made little or no progress in his parenting skills. She said that, each visit, both parents had to re-learn parenting skills they had been taught in previous visits, and then had to be reminded about when to employ those skills. Mr. Griffith testified that the parents' home was unsafe even for visits with the child, and that at the time of trial the parents were no closer to being able to parent the child than when he was removed in August 2011.

The record contains evidence that Grandmother was willing to provide at least some assistance to Mother and said that she was willing to move in with Mother, Father and their child "[i]f I have to." However, the evidence in this case, including the testimony of Dr. Greaves, Dr. Glennon, Ms. Taylor, and Mother herself, makes it clear that the "assistance" needed to ensure that the child receives proper care "would have to, in effect, be a substitute parent, with [Mother and Father] acting only as . . . caring but incompetent bystander[s]." *Mims*, 285 S.W.3d at 449. As in *Mims,* the child that is the subject of this appeal "need[s] and deserve[s] a parent who can take care" of him. *Id.*

It is clear in this case that both parents worked hard to comply with the DCS permanency plan, maintain regular visitation, and build a relationship with the child. As we stated in *Oliver,* "We do not doubt that Mother and Father have striven mightily to overcome their obstacles to parenting competently. Some obstacles, however, simply cannot be overcome. The evidence gives us no reason to hope that either parent's mental competence would improve so that they could care for their child[]." *Oliver,* 2007 WL 4553036, at *8.

Overall, the record fully supports the trial court's conclusion that DCS established by clear and convincing evidence the grounds of mental incompetence and persistent conditions. We go on to consider the best interest of the child.

## Best Interest

The statutes on termination of parental rights also require the court to find by clear and convincing evidence "[t]hat termination of the parents['] . . . rights is in the best interests of

-19-

the child." Tenn. Code Ann. § 36-1-113(c)(2). A finding of grounds to terminate the parental rights of a biological parent does not automatically mean that termination is in the child's best interest. *Dep't of Children's Servs. v. S.M.D.*, 200 S.W.3d 184, 201 (Tenn. Ct. App. 2006). In considering a petition to terminate parental rights, the court is to make a determination of best interest from the perspective of the child, not the parent. *In re Audrey S.*, 182 S.W.3d at 878. Ascertaining the child's best interest is a fact-intensive inquiry. *Id.*

As referenced by the trial court below, courts evaluate the evidence on best interest in light of several statutory factors set forth in Tennessee Code Annotated § 36-1-113(i),[6] as well as any other relevant factors. *In re Giorgianna H.*, 205 S.W.3d at 523; *Mims*, 285 S.W.3d at 447-48. The party who seeks termination bears the burden of proving by clear and convincing evidence that termination of the parental rights of each parent is in the child's

---

[6] The statutory factors to be considered in determining the child's best interests are:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
> (8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
> (9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(1)-(9) (2012). Neither the trial court nor this Court is required to apply each and every factor. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The relevancy and weight accorded to each factor depends on the unique facts in the case. *In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005).

best interest. ***In re Arteria H.***, 326 S.W.3d 167, 175 (Tenn. Ct. App. 2010); Tenn. Code Ann. § 36-1-113(c).

On appeal, Mother notes that she has taken "extraordinary steps to comply with the DCS Permanency Plan" and that she has "made every effort to maintain and develop a relationship with [the child]." Mother argues that the record contains no proof that she ever "did one single thing to harm the child" or that the child suffered any adverse effect from his contact with Mother. Mother reiterates that Dr. Greaves' testimony is tainted by the fact that Dr. Greaves never saw Mother interact with the child.

Father argues on appeal that many of the trial court's detailed findings on best interest apply only to Mother. Specifically, Father contends that the trial court erred in finding that he had to be redirected in visits. Father points to Taylor's testimony that he was merely reminded to interact with the child, while it was Mother's inappropriate behavior that Taylor had to redirect. Father points out that while the trial court's order notes that Father is a registered sex offender, it fails to take into account the result of Dr. Glennon's psychosexual testing, showing that Father does not pose a significant risk to his child. Father also contends that the limited supervised once-a-week visits were not sufficient for him to maintain and develop a relationship with Son.

It must be acknowledged that this is not a case in which the parents have actively abused their child; to the contrary, it is clear that the parents have made substantial efforts to attend parenting classes, visit their child regularly, and forge a relationship with the child while he is in foster care. The DCS witnesses acknowledged that Mother and Father love their child. It is understandable for the parents to desire to continue to have at least the opportunity to continue to visit the child periodically, even if they are unable to take custody and care for the child's day-to-day needs.

However, our consideration of the child's best interest is informed by our finding that clear and convincing evidence supports the trial court's finding that neither Mother nor Father is mentally competent to care and provide for the child. We have observed:

> [T]he statutes on termination of parental rights are established not only to protect a child from a parent who actively abuses him, but also to avoid the harm visited upon a child by spending years in the uncertainty of foster care because his biological parents are unwilling or unable to care for him properly, and yet will not voluntarily relinquish their parental rights so that the child will be available for adoption and a permanent home. Such parents may recognize that they are unable to shoulder the responsibility of caring for the child, but wish for a relationship with the child that does not require caring for the child's

-21-

needs. The statutory scheme enacted evidences recognition by the Legislature that, unless the parental rights of such a parent can be terminated, a substantial number of children will spend their childhood in foster care, with no possibility of a permanent home.

*Oliver,* 2007 WL 4553036, at *9 (quoting *In re Marr,* No. M2001-02890-COA-R3-CV, 2003 WL 152640, at *10 (Tenn. Ct. App. Jan. 23, 2003), *judgment vacated for lack of standing*, 127 S.W.3d 737 (Tenn. 2004)). The best interest of the child "must be evaluated in light of the statutory purpose of determining whether the child would be able to safely live with the parents." *In re Marr,* 2003 WL 152640, at *11. The *Oliver* Court noted that the legislative intent behind the statutes on termination of parental rights "is not simply to establish a 'meaningful relationship' between a child and his or her parents; it is to return the child to the care of his parents." *Oliver,* 2007 WL 4553036, at *10 (emphasis omitted) (quoting *Tenn. Dep't of Children's Servs. v. D.G.B.*, No. E2001-02426-COA-R3-JV, 2002 WL 31014838, at *9; 2002 Tenn. App. LEXIS 647, at *26-27 (Tenn. Ct. App. Sept. 10, 2002)). The *Oliver* Court emphasized:

[T]he focus of the termination statute is on whether the child can safely live with the parent and have his, that is, the child's, day-to-day needs met. Some of the grounds, such as abuse of the child, are reasons for which the parent can be faulted. Other reasons, such as a parent's mental incompetence, are reasons for which the parent cannot be faulted, but the result nonetheless is that the child cannot safely live with the parent in such a way that the child's needs will be met. . . . For a child who is in foster care, failing to terminate the. . . parent's parental rights means that the child will spend his childhood in foster care, with no permanent home.

*Oliver,* 2007 WL 4553036, at *10 (quoting *In re Marr,* 2003 WL 152640, at *12). We cannot ignore the legislative intent behind the termination statutes. As in *Oliver,* "continuation of the [child's] relationship with Mother and Father would prevent [his] adoption and mean that [he] would spend [his] childhood in foster care, with no permanent home. That is substantial harm indeed." *Oliver,* 2007 WL 4553036, at *10.

None of the arguments offered by Mother and Father on best interest change the fact that neither of them is – or will be – competent to take custody of the child. In light of this, we must affirm the trial court's finding that termination of the parental rights of both Mother and Father is in the best interest of the child at issue in this appeal. Overall, we must conclude that the evidence in the record fully supports the trial court's termination of the parental rights of both Mother and Father. All other issues presented in this appeal are pretermitted by this decision.

**CONCLUSION**

The decision of the trial court is affirmed. Costs on appeal are assessed against Respondent/Appellants D.W.M., Sr. and J.A.B., for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE